STATE of Minnesota, Respondent,

v.

James T. SLOWINSKI, Appellant.

No. C9-89-42.

Supreme Court of Minnesota.

Jan. 12, 1990.

James T. Slowinski, pro se.

C. Paul Jones, State Public Defender, Cathryn Middlebrook, Asst. State Public Defender, Minneapolis, Minn., for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Minn., and Thomas Johnson, Hennepin County Atty., Mark V. Griffin, Asst. County Atty., Minneapolis, Minn., for respondent.

WAHL, Justice.

Defendant James T. Slowinski was found guilty of premeditated murder (Minn.Stat. § 609.185(1) (1986)) and murder in the first degree while committing or attempting to commit first degree criminal sexual conduct (Minn.Stat. § 609.185(2) (1986)), in connection with the September 13, 1987 stabbing death of his neighbor Sherry Syverson. In this appeal, defendant claims that his confession should not have been admitted for the purposes of impeachment because it was involuntary and obtained as a result of psychological coercion and promises of leniency; that the trial court erred in admitting three *Spreigl* incidents; that four tape-recorded conversations between defendant and his former wife should not have been admitted into evidence; and that the evidence was insufficient to sustain his conviction for first degree murder. We affirm the judgment of conviction in all respects.

The victim, Sherry Syverson, twenty-seven years old, lived with her sister Jane on the ground level of a large multi-unit apartment complex in Bloomington, Minnesota. On Sunday, September 13, 1987 the Syverson sisters attended church and lunched together, returning home around 2:00 p.m. After lunch, Jane Syverson attended a friend's recital in downtown Minneapolis. Sherry Syverson had no plans for Sunday afternoon. Jane Syverson called her sister at approximately 7:00 p.m. and told her she would not be home until quite late. During their conversation, her sister did not mention that anything was out of the ordinary.

Jane Syverson arrived home at approximately 1:35 a.m. on Monday, September 14, 1987. She went into her bedroom and saw her sister bound and gagged on her bed. She immediately called the police who found Syverson lying dead at the foot of the bed. The only piece of clothing on her body was a sweatshirt which was bunched up near her head. Her mouth was bound with black electrical tape, and her hands were tied behind her back with tape. Syverson's throat was cut, she had numerous other stab wounds, and her breasts had been slashed open. Her vaginal area was torn and specked with blood. A curling iron was on the floor next to the bed; black teeth were missing from the comb. Some of the missing teeth were later found scattered throughout the bedroom.

In the living room the police found a filet knife and sheath, and a pair of grey gloves. They also found a roll of black electrical tape and an ice cube tray. The ice cube tray was placed at an angle on a wicker chair in the living room, and the tray was full of water. In the other bedroom, the police found the matching sweatpants to the sweatshirt Syverson was wearing, with underwear intertwined. In the bathroom, they found a blood-stained towel on the floor and blood-stained toilet paper in the toilet.

At approximately 3:00 or 3:30 a.m., a police officer arrived with his police dog "Max." Two officers went outside the Syverson patio with the police dog and gave Max the "seek and fetch" command to search for evidence. Max immediately developed a "strong interest" in the deck and door area of the apartment next to the Syverson apartment, apartment number 1. Max went up to the patio of apartment

number 1 and found two fresh Benson & Hedges cigarette butts. Another investigating officer, Detective Laurila, then went to apartment 1 and knocked on the patio door. When defendant answered the door, Laurila recognized him from another case. Laurila asked defendant if the cigarette butts were his; defendant said yes, he often stood on the edge of his patio and smoked. At that time, the conversation ceased.

Half an hour later two police officers went on a door-to-door canvas of the apartment complex. They knocked on the door of apartment 1 at approximately 4:00 a.m., and defendant answered the door. The police told the defendant and his wife, Bonnie Slowinski (now Cameron), that they were conducting a criminal investigation and asked if the Slowinskis had seen or heard anything that night. Cameron told the police she went to bed around 8:00 or 8:30, and defendant said that he had gone to bed soon after. The Slowinskis said that they had not heard anything.

Later that night another police officer saw defendant leave his apartment and walk to a dumpster at the north end of the building. Defendant had a bag of trash in his hand. No one ever investigated what was in the trash bag because at that time a friend of Sherry Syverson's, T.S., not defendant, was a suspect. The investigation originally focused on T.S. because Jane Syverson gave his name to the police as a friend of her sister's. She supplied T.S.'s name because he was the only male friend of Sherry Syverson's that she knew, and he had visited Sherry Syverson two or three days before and asked for a loan. The investigation also focused on T.S. because an examination of the apartment revealed no visible signs of forced entry. Nor were there any signs of a struggle within the apartment. When the apartment was examined, the back door to the patio was unlocked and slightly ajar. Because there were no signs of forced entry, the police suspected that Syverson knew the person and allowed him into her apartment.

Dr. Susan Roe of the Hennepin County Medical Examiner's Office examined Sherry Syverson's body in the early morning hours of September 14. Dr. Roe estimated that Sherry Syverson was killed sometime between 7:00 p.m. and 11:00 p.m. on September 13, 1987. An autopsy revealed that Syverson had 15 stab wounds. The stab wounds on Sherry Syverson's body were consistent with the knife found in her apartment. A sexual assault examination was also conducted. There was visible trauma to Syverson's vaginal and anal area but no sperm or seminal matter was found. Dr. Roe did find some small black plastic teeth inside Syverson's vagina. The teeth appeared to be from the curling iron found inside the Syverson apartment. There was also hair, blood and possibly fecal matter on the curling iron.

Black electrical tape was removed from the hands of Syverson during the autopsy. A second piece was removed from around her head and mouth. The two pieces of tape and the roll of tape found in the living room were examined for fingerprints. A partially smeared print, with a distinctive "whirl" characteristic, was found on the tape removed from Syverson's wrists. It was determined that the original suspect, T.S., could not have made the print lifted from the wrist tape. An identifiable print was also found on the roll of tape left in the Syverson's living room. It was determined that the print on the roll of tape could not have been made by either T.S. or Sherry Syverson.

Detective Laurila, when contacted to obtain the names of additional suspects, gave defendant's name because defendant had two prior sexual assault charges and lived next door to Syverson. A set of defendant's fingerprints was obtained and compared to the prints lifted from the two different pieces of tape. The print on the roll of tape found in the living room had at least 20 points which matched those of defendant. Defendant's prints had the same distinctive whirl pattern as the smeared print lifted from the tape on Syverson's wrists.

The tape which had come from around Syverson's mouth and head was also examined for prints. The tape had been

wrapped around itself so there were layers of tape on top of tape. Underneath a layer of tape there was another identifiable print. Defendant's fingerprints matched that print as well with 22 matching points. A third full print was lifted from the bottom layers of the tape on Syverson's face and it also matched defendant's fingerprints.

On September 16, 1987, the police learned that defendant's fingerprints had been identified on the electrical tape. Detective Laurila obtained a search warrant for Slowinski's apartment. Both defendant and Cameron were present when the police arrived. Defendant was immediately placed under arrest and taken to the police station. While defendant was at the police station, Laurila showed Cameron a photocopy of the knife recovered from Syverson's apartment. He asked her if the couple had a similar knife; Cameron immediately got up and went into the kitchen and looked in a drawer. The knife Cameron went to look for was not in the drawer. Cameron identified the filet knife as belonging to her husband. She also told Laurila that defendant was missing some clothing—a pair of jeans, a beige corduroy shirt-jacket and a T-shirt. Cameron identified the grey gloves found in the Syverson apartment as looking like a pair owned by her husband. Defendant's gloves were missing. The police found black electrical tape in defendant's tool box similar to that used to bind Syverson.

On the day defendant was arrested, he confessed to the murder of Syverson. Defendant said that on the night of September 13, 1987, he was standing outside on his patio when Syverson came out onto her patio. His wife was in bed sleeping. Defendant began talking to Syverson. When she went back to her apartment for a minute, he went to his apartment and got the gloves, tape and knife and returned to the patio. Syverson returned to the patio with some ice cubes and defendant asked her for some of the ice cubes on her tray. She asked him if he wanted to come in. He went inside, put his hand over her mouth, taped her arms and mouth and took her into the bedroom where he took off her clothes and attempted, but failed, to have

sexual intercourse with her. Defendant did not precisely recall what happened after he failed to have intercourse with her, but he remembered inserting the curling iron and he remembered stabbing her.

At trial defendant testified that his wife, Bonnie Cameron, killed Syverson in a jealous rage. Defendant said that on September 13, 1987, between 3:00 and 3:30 p.m., he saw Cameron talking to Syverson in the hallway. Defendant said that Cameron went with Syverson into the Syverson apartment and yelled at Syverson. When Cameron returned to their apartment five minutes later, he said that she told him that if she ever saw Syverson around him again, she would kill Syverson. Later that evening, defendant said he went to Syverson's apartment and told her to never even say "hi" to him because his wife was so jealous. He said when he went home his wife was on the couch and knew he had been talking to Syverson. He stated that he went to bed, and the next thing he knew, at approximately 4:00 or 4:30 a.m., the police were knocking on the door. Defendant testified that a few days later, his wife confessed to him that she had killed Syverson because she thought defendant was having an affair with Syverson. Defendant testified that he knew all the details of the crime he had told the police because his wife had confessed them to him.

The defense witnesses testified about Cameron's jealous nature. Manetta Slowinski, defendant's mother, testified that Cameron was a jealous, possessive, bossy woman. She said she had observed Cameron act in a threatening manner towards her son and punch defendant in the face. She said that her son had given her a knife that he claimed Cameron had used to try and stab him. Mrs. Slowinski testified that her son loved Cameron so much that in her opinion he would take the blame for the murder of Syverson. The jury, however, found defendant guilty as charged; the court sentenced him to life imprisonment.

1. We first address defendant's claim that the trial court erroneously ruled that his confession could be admitted for im-

peachment purposes. On September 16, 1987, defendant was arrested, given a *Miranda* warning and questioned by Detectives Williams and Laurila for approximately four hours in an interview room at the Bloomington Police Department. Defendant's wife, brought in at his request, also asked some questions. Defendant ultimately signed a statement confessing to the murder of Syverson. The trial court suppressed the confession because during the interrogation defendant indicated he wanted to see his attorney and Detective Williams did not clarify defendant's wishes as required by *State v. Robinson*, 427 N.W.2d 217 (Minn.1988).

At the close of the state's case, however, the trial court determined that though the confession had been obtained in violation of defendant's right to counsel, it was voluntary and could be used to impeach defendant's testimony should he take the stand. Because of this ruling, defense counsel brought out the confession on direct examination when defendant testified. Defendant argues that the trial court's ruling was in error, that his confession was involuntary because of promises of leniency and psychological coercion, and that it should not have been admitted for any purpose. Therefore, defendant argues, he is entitled to a new trial.

█ A confession obtained in violation of defendant's constitutional right to counsel may be used for the purposes of impeachment, but only if voluntary. *Harris v. New York*, 401 U.S. 222, 224–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971) (if trustworthiness satisfies legal standards, confession may be used to impeach). *See also Mincey v. Arizona*, 437 U.S. 385, 397, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). If defendant's confession was involuntary, it was not admissible at trial. *Mincey*, 437 U.S. at 402, 98 S.Ct. at 2418; *State v. Garner*, 294 N.W.2d 725, 727–28 (Minn. 1980).

Whether a confession was voluntary depends, in this jurisdiction, on the totality of the circumstances. *State v. Jungbauer*, 348 N.W.2d 344, 346 (Minn.1984). The totality of the circumstances is a subjective, factual inquiry. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). Relevant factors to be considered include:

> the age, maturity, intelligence, education, and experience of the defendant and the ability of the defendant to comprehend; the lack of or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; whether the defendant was deprived of any physical needs; and whether the defendant was denied access to friends.

*Jungbauer*, 348 N.W.2d at 346. The defendant in this case was not a neophyte in the criminal justice system. He was 27 years old, he had been arrested on at least three occasions, twice for criminal sexual offenses, and had invoked his rights in at least one of those prior arrests. The arrest of defendant and the search of his home was legal. When defendant was arrested he was read the *Miranda* warning and responded that he understood his rights.

The interrogation in this case was videotaped and has been made available to the court. Defendant was read the *Miranda* warning at the outset and indicated that he understood his rights. The interrogation lasted from approximately 3:30 p.m. until 7:30 p.m., with intermittent breaks. During the 4–hour period defendant sat in a chair without handcuffs, and was allowed to smoke, drink Coke and water, and go to the bathroom. Defendant also indicated on numerous occasions during the interrogation that he was willing to talk to Detective Williams. He did indicate that he would like to speak with his wife. This request was refused at first, but eventually he was allowed to call her on the telephone, and she came to see him. Defendant was lucid and appeared to understand what was at stake in the investigation.

█ Defendant claims that the methods used by the police to obtain his confession were coercive. First, he argues that the police implied that by confessing defendant might be charged with a lesser crime. Second, he argues that the police suggested they had influence with the county attorney to have him charged with a lesser

crime or to ensure that he received psychiatric help.

We have made clear that "[p]olice should avoid making promises * * * in order to encourage a defendant to confess. However, courts do not mechanically hold confessions involuntary just because a promise has been involved." *State v. Anderson*, 298 N.W.2d 63, 65 (Minn.1980). Whether or not the promises rendered the confession involuntary is an element to be considered in the totality of the circumstances. *E.g., State v. Anderson*, 396 N.W.2d 564, 565 (Minn.1986).

When the detectives spoke with defendant, they explained to him the various degrees of murder and encouraged him to explain what happened so that if there were mitigating circumstances, they would be considered in the charges filed. It is not improper for police officers to inform a defendant of the various degrees of murder. *State v. Merrill*, 274 N.W.2d 99, 107 (Minn.1978). There is no evidence in this case that the detectives promised defendant that in exchange for his confession, he would be charged with an offense less than first degree murder.

■ Defendant's second argument is that the police improperly suggested that they had influence with the county attorney to argue for psychiatric help or a lesser charge if there were mitigating circumstances. Just before defendant confessed, the detectives talked to him about getting psychiatric help. They told him that he needed counseling for what he did to Syverson. The detectives also implied that the county attorney would listen to them if they suggested counseling and would abide by their wishes.

Though the police may have improperly suggested to defendant that they had the influence with the county attorney to argue for psychiatric help or mitigating circumstances to first degree murder, they only told him they would tell the county attorney and that the county attorney must decide. They did not promise he would be sent to St. Peter Security Hospital as opposed to prison, nor did they promise that defendant would not spend time in jail.

The statements, though improper, were not the kind of statements that would make an innocent man confess. *Jungbauer*, 348 N.W.2d at 346–47. The statements did not, under the totality of the circumstances, render the confession involuntary.

The facts of the instant case are not like those in *State v. Biron*, 266 Minn. 272, 123 N.W.2d 392 (1963). In *Biron* the police officers told a juvenile offender that if he did not confess they would not even consider taking him before the juvenile court and said that they could actually determine whether defendant was tried as an adult or a juvenile. *Id.* at 277–78, 123 N.W.2d at 396. Thus, while the statements of the police in this case are not to be condoned because of the implication that the county attorney would follow the detectives' wishes, in the context of the entire interrogation, the statements did not amount to psychological coercion which would render defendant's confession involuntary. *See also State v. Anderson*, 404 N.W.2d 856 (Minn.App.1987) *pet. for rev. denied*, (Minn. June 25, 1987) (police induced a confession by telling a defendant that if he confessed he would receive free psychiatric help and avoid criminal charges). We hold the trial court properly ruled that defendant's confession was voluntary and admissible for purposes of impeachment.

2. We next consider the issue of whether the trial court erred in admitting evidence of three *Spreigl* incidents for the purpose of linking defendant to the murder of Syverson.

*The H.S. incident.* H.S. testified that on August 4, 1984, she was raped by defendant. She had met him at a bar in Eagan and he had followed her home. For a time they sat outside her house talking. H.S. testified that initially she was not afraid of defendant, but then she suddenly became frightened by something he said and started to run inside. Defendant followed her inside her home, took the belt H.S. was wearing and tied her hands behind her back. Defendant had a knife which he used to cut H.S.'s clothes off. He told her that if she did not submit to having sex with him, he would "cut it all off." Defen-

dant then got a bottle of rum and poured it down H.S.'s throat. She testified that something happened to make defendant angry, and he took a coke bottle and inserted it in her vagina. He also stuffed her underwear in her mouth so she couldn't scream. Defendant raped H.S. three times. After he left in the early morning, H.S. called the police. She positively identified defendant as the man who raped her. Defendant subsequently pled guilty to the charge and underwent chemical dependency and sex offender treatment.

*The J.W. incident.* J.W. and defendant had an affair in August, 1984, then stopped seeing one another. Just after they split up, defendant came to visit J.W. at her home. After they talked, defendant left J.W.'s home, but returned later, walked into the kitchen and grabbed a knife. He held the knife to her chest. Defendant said, "Take your clothes off." J.W. said she was not afraid, she thought defendant was joking because he was smiling the entire time. After a few minutes defendant handed her the knife and left. J.W. contacted the police approximately one month later after she learned of an Apple Valley rape where the description of the suspect matched defendant.

*The M.H. incident.* Jay Cameron, Bonnie Cameron's son, and M.H. testified about an incident that occurred on March 28, 1987, six months before the murder of Syverson. Jay Cameron and defendant, out walking around looking for a party, knocked on the door of a neighboring apartment. They went inside and smoked marijuana with the people inside. After approximately forty-five minutes, Jay Cameron and defendant left the apartment and waited outside until the men in the apartment left. Defendant and Jay Cameron returned to the apartment and knocked on the door. M.H., the woman who lived in the apartment, answered the door and asked them what they wanted. Defendant said he wanted to use the telephone. He used the phone, then asked for a glass of

water. After M.H. got the water, defendant walked into the kitchen, picked up a knife, grabbed M.H. and threw her against the wall. He held the knife up to her throat and told her to take her clothes off. Defendant put his hand up M.H.'s shirt and grabbed her breast. After a few minutes, at the urging of Jay Cameron, defendant and Cameron left. M.H. immediately called the police. Defendant was arrested the next day and was awaiting trial on this charge at the time of the Syverson murder.

■ Evidence of other crimes, while generally inadmissible to prove an accused committed the present offense, may be admitted to establish motive, intent, absence of mistake or accident, identity or common scheme or plan. *State v. Spreigl,* 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965). *See also* Minn.R.Evid. 404(b). Admission of *Spreigl* evidence rests within the sound discretion of the trial court. Absent a clear abuse of that discretion a trial court's ruling will not be disturbed. *E.g., State v. Ture,* 353 N.W.2d 502, 515 (Minn.1984).[1] Because *Spreigl* evidence has the potential for unfair prejudice to the defendant, we have circumscribed its introduction with the following applicable procedures:

(a) Evidence of other crimes may not be received unless there has been notice as required by *State v. Spreigl,* 272 Minn. 488, 496, 139 N.W.2d 167, 173. (Applicable to all cases tried after December 17, 1965).

(b) At the time the evidence is offered, the prosecutor shall specify the exception to the general exclusionary rule under which it is admissible.

(c) If evidence of other crimes is received for purposes of identity rather than to show a common scheme or plan, there must nevertheless be some relationship in time, location, or modus operandi between the crime charged and the other offenses.

(d) Evidence of other crimes is admissible only if the trial court finds the

---

1. Defendant bears the burden of proving that the trial court erred in admitting the evidence and that defendant was prejudiced by admission of the evidence. *State v. Loebach,* 310 N.W.2d 58, 64 (Minn.1981). The harmless error standard of review applies to the admissibility of the *Spreigl* evidence. *State v. Link,* 289 N.W.2d 102, 106 (Minn.1979).

direct or cirumstantial evidence of defendant's identity is otherwise weak or inadequate, and that it is necessary to support the state's burden of proof. It should be excluded where it is merely cumulative and a subterfuge for impugning defendant's character or for indicating to the jury that he is a proper candidate for punishment.

(e) The evidence of defendant's participation in other crimes need not be proved beyond a reasonable doubt but must be clear and convincing.

(f) Both at the time the evidence is received and in the final charge, the court should admonish the jury that the testimony is received for the limited purpose of establishing identity. It is the court's duty to advise the jury in unequivocal language that defendant is not being tried and may not be convicted for any offense except that charged, warning them that to convict for other offenses may result in unjust double punishment.

*State v. Matteson*, 287 N.W.2d 408, 410–11 (Minn.1979); *State v..Billstrom*, 276 Minn. 174, 178–79, 149 N.W.2d 281, 284–85 (1967).

▮ With respect to the "clear and convincing" prerequisite to the introduction of *Spreigl* evidence, the trial court did not err in concluding that evidence of defendant's participation in these incidents was clear and convincing. Defendant pled guilty to the rape of H.S. The M.H. incident was corroborated by M.H. and Jay Cameron and the fact that defendant admitted being present in her apartment. *See State v. Rainer*, 411 N.W.2d 490, 497 (Minn.1987). While there was no corroboration of J.W.'s testimony, the trial court concluded that the evidence of that incident was clear and convincing and we find no abuse of discretion.

The *Spreigl* evidence is particularly important with regard to identity of the person who killed Syverson. Defendant argued at trial, and on appeal, that his wife murdered her. *Ture*, 353 N.W.2d at 515 ("evidence of defendant's prior offenses was relevant to identity which he placed in issue by denying his confession and presenting an alibi"). Each incident involved the use of a knife, the request to take off clothes, the sexual threats, and, with M.H., the actual touching of her breasts. The murder of Syverson involved a knife, the removal of clothes, and a sexual assault.[2] In previous cases, this court has not required identical "signature" crimes in affirming the admissibility of past crimes. *See, e.g., Matteson*, 287 N.W.2d at 411; *Rainer*, 411 N.W.2d at 497. Additionally, the three incidents were closely related in time and place. The H.S. and J.W. incidents occurred three years before the Syverson murder and the M.H. incident took place only six months before Syverson's death, at the same apartment complex. *Rainer*, 411 N.W.2d at 497–98.

The *Spreigl* evidence was also necessary to support the state's burden of proof. *Matteson*, 287 N.W.2d at 411; *State v. Hudson*, 281 N.W.2d 870, 873 (Minn.1979). Without defendant's confession, the state was left with three fingerprints, the knife, and the gloves. Defendant also argues that even if relevant, the *Spreigl* evidence should not have been admitted because on balance the *Spreigl* evidence had an unfair prejudicial effect. *E.g., State v. Filippi*, 335 N.W.2d 739, 743 (Minn.1983). The trial court was within its discretion in concluding that the probative value of the evidence outweighed its prejudicial effect. The fact that the judge read four cautionary instructions to the jury—once before the testimo-

2. With respect to the H.S. incident, the state points out the connection between the defendant's prior acts of violence and the present murder case:

His method of prolonged sexual assault was very distinctive. He bound H.S.'s hands behind her back with a belt, Syverson's hands [were bound] behind her back with tape. He gagged H.S., Syverson [was gagged]. He moved H.S. around her apartment; Syverson [was moved] from one bedroom to another. He yanked H.S.'s pants and underwear off in one motion; Syverson's underwear was found entwined in her sweatpants, as if they had been pulled off together. He threatened to mutilate H.S. with a knife; Syverson's breasts [were slashed] with a knife. He inserted a soda bottle into H.S.; a curling iron [was inserted] into Syverson.

ny of each witness, and once at the close of the entire case—lessened the probability of undue weight being given by the jury to the evidence. We hold that the *Spreigl* evidence was properly admitted.

■ 3. Defendant's third challenge is to the admission of four tape-recorded conversations between himself and Cameron. Cameron recorded the conversations when defendant made prearranged calls to her from prison. Defendant argues that the tapes were illegally obtained because Detective Laurila provided the recording equipment and Cameron purposefully attempted to solicit incriminating statements from him, rendering the tapes inadmissible because the conversations amounted to an interrogation without counsel present. Once a defendant is placed under arrest and indicates a desire to consult with an attorney, he may not be interrogated unless counsel is present. *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964).

The United States Supreme Court recently clarified the standards to apply to situations where police obtain "incriminating statements" through secret tape recordings. The operative factor in finding a constitutional violation is knowing exploitation by the state of an opportunity to interrogate a defendant after the right to counsel has attached. *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985). Cameron began to record the prearranged phone calls defendant made to her from the jail because after he was arrested she received anonymous threatening phone calls, and after the couple's divorce two months later she started receiving threatening phone calls from defendant and his parents. Defendant told her the "jail-to-street system worked really well." Her car and storeroom were broken into and the lug nuts loosened on the wheels of her car. When the tape recorder Cameron purchased from Radio Shack did not work, she borrowed one from Detective Laurila and continued to record. She recorded conversations from January through March, 1988. Cameron testified that she did not ask the police what to say to defendant,

nor at any time did the police tell her to try to get defendant to talk about the case. She turned the tapes over to Laurila in May, 1988, but he did not listen to them until June or July, 1988.

The tapes were introduced at trial to show that defendant kept changing his story regarding who killed Syverson. Since it was apparent to the jury during defendant's direct testimony that he kept changing his testimony, the tape evidence, even if obtained in violation of defendant's right to counsel, was at most cumulative, rendering its admission harmless error. Under the facts and circumstances of this case, we hold the trial court did not err in admitting the tape-recorded conversations between defendant and his former wife.

■ 4. Finally, defendant argues that the evidence is insufficient to prove beyond a reasonable doubt that he, not someone else, committed first degree murder. He argues that the evidence used to convict him is equally consistent with the conclusion that his wife, Bonnie Cameron, killed Syverson. This was his theory of defense. He introduced evidence at trial that his wife was a jealous, mean, dominating, bossy woman; that she constantly imagined that her husband was having an affair with other women; that she punched him, defendant, in the face. There was testimony from defendant and his mother that Cameron tried to stab defendant. On the stand and in his pro se brief, defendant said that on September 13, 1987, between 3:00 p.m. and 3:30 p.m., his wife got into a screaming argument with Syverson and later stabbed her in a jealous rage. Defendant testified that Cameron confessed to him that she killed Syverson. The jury did not believe this version of events.

In reviewing the sufficiency of the evidence, this court makes a painstaking review of the record to determine if the evidence is sufficient to permit the jury to reach the conclusion it did. * * * [The court] will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reason-

ably conclude that a defendant was proven guilty of the offense charged. ·*State v. Alton*, 432 N.W.2d 754, 756 (Minn. 1988). However, in the present case, the evidence convicting defendant is entirely circumstantial. We will sustain a verdict based on circumstantial evidence "when the reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* The evidence in this case and the reasonable inferences to be drawn from that evidence are inconsistent with any rational hypothesis except that of defendant's guilt.

Three fingerprints were found in the Syverson apartment. One fingerprint, on the empty tape canister in the living room, matched defendant's fingerprints in at. least 20 points. Two other prints, lifted from inside the tape used to wrap Syverson's mouth, were found to match defendant's prints. An expert witness testified that the fingerprints on the inside of the tape could not have been left by someone just touching the outside of the tape. The filet knife found in Syverson's apartment was identified by Cameron as belonging to defendant. The knife found in the apartment was consistent with Syversons' stab wounds. A pair of grey gloves found in the Syverson apartment were identified by Cameron as belonging to her husband. In addition to the fingerprints was the fact that defendant lived next door to the Syversons. He was acquainted with both of the Syversons. There was no sign of a struggle in the apartment. The police dog followed a scent from the Syverson patio to the Slowinski patio. Fresh cigarette butts of the kind of cigarette defendant smoked were found outside the Slowinski patio. Furthermore, as the *Spreigl* evidence demonstrated, defendant had a pattern of physical, sexual assaults on women. On a least two of the three occasions, he used a knife to carry out his threats.

A jury normally is in the best position to evaluate circumstantial evidence. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). They determine the weight and credibility given to testimony of individual witnesses. *State v. Bias*, 419 N.W.2d 480, 484 (Minn.

1988). The jury obviously concluded, based on all the evidence, that defendant, not his wife, killed Syverson. No evidence leads to any other rational conclusion. We hold the evidence is sufficient to prove beyond a reasonable doubt that defendant committed first degree murder. The judgment of conviction is affirmed.

Affirmed.