**STATE of Minnesota, Respondent,**

v.

**Robert Raymond BLAIR, Appellant.**

**No. C6–90–2529.**

Court of Appeals of Minnesota.

Aug. 27, 1991.

Review Denied Oct. 11, 1991.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, Roger S. Van Heel, Stearns County Atty., St. Cloud, for respondent.

John M. Stuart, State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by PETERSON, P.J., and FOLEY and KALITOWSKI, JJ.

## OPINION

FOLEY, Judge.

Appellant Robert Raymond Blair appeals two convictions for criminal liability for others' theft in connection with shoplifting by two teenage girls under his direction in two trips to one store in one day. Blair contends both convictions cannot stand because the lesser offense is based on the same criminal act on which the greater offense is based in part. He also challenges the trial court's admission of other crimes evidence and refusal to submit a lesser included offense, an order that he reimburse extradition costs, and a double durational departure in sentencing. We affirm as modified and remand.

## FACTS

On December 15, 1989, Blair was charged by complaint with one count of criminal liability for others' theft over $2,500 in violation of Minn.Stat. § 609.05, subd. 1 (1988) and Minn.Stat. § 609.52, subd. 2(1) (Supp.1989). Blair entered a negotiated plea of guilty to a reduced charge, but did not appear for sentencing. A bench warrant was issued and Blair was later extradited from Kentucky. He subsequently withdrew his guilty plea.

By amended complaint, a count was added charging Blair with criminal liability for others' theft over $500 in violation of Minn. Stat. § 609.05, subd. 1 and Minn.Stat. § 609.52, subd. 2(1). Blair was convicted of both offenses by virtue of a jury verdict. The trial court sentenced Blair to concurrent executed terms of 52 and 46 months, a double durational departure from the sentencing guidelines' presumptive sentences. The trial court also ordered Blair to reimburse $2,472.24 extradition costs. Blair makes a direct appeal.

The charges against Blair arose out of two separate shoplifting forays at a Target store in St. Cloud on November 11, 1989. A plainclothes Target security officer, Holly Kujas, testified she worked at Target on November 11 from 2:30 to 10:30 p.m. Kujas testified that, early in her shift, she noticed a locked display case containing expensive electronic equipment such as VCRs and CD players had been opened. Kujas said the lock on the case had not been broken, but the glass door was off its track and the lock was completely off. Store employees had not opened the display case. The case was re-locked.

Kujas testified she frequently checked the area during the day, and, later in the evening, saw what she considered to be suspicious behavior. She noticed a male and a female with a shopping cart. In the cart were a VCR and a small CD player.

Kujas described the female as small with blond hair and about age 16 or 17. She described the male as "ordinary." At trial, she could not identify Blair as the man.

After being told store employees had not opened the display case, Kujas concluded it had been broken into again. She followed the man and the teenage girl. They put more items into the cart. Kujas testified it appeared the man was telling the girl what to put into the cart.

Kujas said the couple separated as they headed toward the front of the store. Kujas followed the girl. The girl continued through the store, acting as if she was shopping. Kujas observed the girl open a box of garbage bags on display, take one out and go to the back of the store. The girl put CD players in the bag, put the bag on the bottom of the cart, and put a VCR and "big stuff" such as a dinnerware set and a cookware set on top.

Kujas saw the girl go to the front of the store. The girl left the cart in front of the service desk and stood looking around for a few minutes. Kujas said the girl met another girl, who was also age 16 or 17. Kujas said they talked and then went to the back of the store. Kujas stayed with the cart. After a few minutes, the two girls came back to the front of the store, stood a few seconds, looked around and left together. The girl Kujas had originally been following pushed the cart out the door. Neither girl paid for the merchandise.

Kujas waited until they were outside the store, approached them, identified herself as a security officer, showed her badge and asked them to come back into the store. The girls ran in separate directions. Kujas ran after the girl she had originally been following. When the girl stopped running, Kujas asked her to go back to the store. Kujas followed her back to the store. Kujas testified the girl looked scared and said there was "a man with a gun. Don't let him see me." She also told Kujas she had not stolen for herself.

When they got back to the store, Kujas took the girl to the security office and called the police. The girl initially gave a false first name but eventually was identified as D.L.

The cart was brought into the store and Kujas did an inventory of the merchandise in the cart. The merchandise included a VCR, two CD players, a dinnerware set, a cookware set and clothing. The total value was about $900.

D.L. implicated another girl and a man she called Robert. She told the police she thought the other girl and Robert were in room No. 213 of a nearby motel. The police went to the motel room and found K.E. K.E. admitted involvement in the shoplifting and was arrested.

Both girls told the police they had stolen from the Target store twice that day and

both identified Blair as being involved. They both told the police Blair had guns.

Both girls testified at trial. D.L. was 15 and K.E. was 16 on November 11, 1989. Both of them had been runaways when they met Blair. They both said Blair regularly took them on shoplifting trips. The pattern was for Blair to tell them what to take and how to take it. He would watch for security guards while they pushed the carts with stolen merchandise out the door. Both K.E. and D.L. testified they had shoplifted at the St. Cloud Target with Blair before the November 11, 1989 incidents.

K.E. testified she first stole for Blair because he gave her food and a place to stay. She testified she became emotionally and sexually involved with Blair and fell in love with him. K.E. believed Blair when he told her they would get married.

D.L. testified she stole for Blair because she wanted to stay on the run and because he told her she would make a lot of money. She said she never got more than $5 or $10 from time to time, however. Once she was involved in stealing for Blair, D.L. did not think she could get out of it because she was scared by Blair pointing guns at K.E. and threatening K.E. to keep K.E. from leaving.

As to the events of November 11, 1989, the girls both testified Blair picked them up in Minneapolis that morning and told them they were going to the St. Cloud Target to steal. He said they would get a motel room.

On their first trip to Target, each girl was successful in taking a full cart of stolen merchandise out of the store. D.L. testified she remembered taking a TV off a display shelf. She said they did not take anything out of the locked display case on the first trip. That testimony was contradicted by K.E., however. K.E. testified Blair pushed in the glass back of the case in a fashion in conformity with the testimony of security officer Kujas. K.E. said Blair put two VCRs in her cart and one in the cart of D.L. K.E. also remembered taking some CD players, telephones, clothing and cigarettes on the first trip.

The girls both testified they went to a motel with Blair and got a room. After spending time in the room, they said they went on another foray to Target. Both testified K.E. got a cart of merchandise out of the store before D.L. was caught with the cart with $900 of stolen goods. K.E. testified she had a VCR in her cart and some telephones. She could not remember what else was in her cart on the second trip, although she thought the cart was full.

D.L. and K.E. admitted they had pleaded guilty to charges in connection with the thefts. K.E. also was shown to have prior shoplifting adjudications. They were also both impeached at trial with prior inconsistent statements to the police.

Furthermore, it was brought out that D.L. not only initially lied to the police about her first name, but also had stated Blair had threatened her with a gun and Blair had forced her to perform oral sex on the way up from Minneapolis. She admitted she had called the police a few days later and told them that those things happened to K.E., but not to her.

On cross-examination, K.E. testified she was still in love with Blair. She admitted that, during the time she was involved with him, Blair was seeing another woman. She also admitted she tried to contact Blair after his arrest for the November 11, 1989 incidents and went to a motel with him once. K.E. denied trying to contact Blair more than that and was impeached with telephone records. On re-direct, she claimed Blair had called her first and had asked her to recant her statement to the police. She said he told her that if she recanted they would get back together and could still get married.

The police testified that, immediately after the arrest of the girls on November 11, 1989, based on information from the girls, the police went to an address on Boardman Street in Minneapolis looking for Blair. An officer who knew Blair went to the front door and saw Blair sitting in the living room. When the officer knocked on the door, Blair ran through the house out of the officer's sight. Blair eventually came

out of hiding in the house and was arrested. Blair's pickup truck, which matched a description given by the girls, was parked outside the house and was impounded.

The next night, the police executed a search warrant at the house on Boardman Street. Numerous property was seized, and the security manager of the St. Cloud Target later prepared a list of items he could identify as from Target.

There was testimony that all of the merchandise was still tagged. The larger items, such as TVs and VCRs had labels identifying them as coming from the St. Cloud Target store. Other items, such as clothing, could be identified as Target merchandise on sale at the St. Cloud Target on November 11, 1989, although it could not be said with certainty that they came from a particular Target store.

The value of all of the items from the house that could be identified as Target merchandise totaled $4,630. The value of the VCRs and TVs alone was over $3,000. K.E. was asked at trial to indicate which items were stolen on November 11, 1989. She was not asked, however, to differentiate between the two trips to Target.

A.P., a fourteen-year-old who lived at the Boardman Street house, testified Blair arrived there between 9:00 and 10:00 p.m. on November 11, 1989. She said Blair offered her money and cigarettes to help him carry things from his pickup truck into the house. She said there were large boxes full of new merchandise and a bag of clothing. A.P. testified it took five or six trips to carry it all in.

The clerk at the St. Cloud motel testified that, on November 11, 1989, a man accompanied by a girl came in and registered for a party of three. At trial, the clerk could not identify Blair as the man.

The motel registration record was entered into evidence. It indicated a room had been rented by "Robert Blair." His employer was listed as Top All Roofing, with a Coon Rapids address. The Coon Rapids address, which was the address of Blair's brother, was also on a car title registration seized in the search of the Boardman Street house.

The state urged the jury to compare the signature on the motel registration with signatures found on documents seized in the Boardman Street search, saying they were clearly similar. Blair's attorney argued it did not make sense that Blair would use his real name to register at the motel.

Blair did not testify at trial but called four witnesses. Kimberly Lindgren and Brenda Blake, both friends of Blair, gave alibi testimony. Daniel Roesch testified he was a roofer with Top All Roofing, Inc. He said that Blair had worked at Top All for a six month period ending in November 1989.

Ione Flint also testified for Blair. She said she met him when she worked at the Stearns County Jail and became romantically involved with Blair after his release from jail. She testified about a call K.E. made to Blair on April 21, 1990.

Flint testified she listened in and heard K.E. say she had caused trouble for Blair because K.E. was jealous he was seeing a woman who lived at the Boardman Street house. Flint testified K.E. said she would sign a statement that she had lied, but K.E. wanted Blair to meet her that night. Flint testified K.E. called back later to ask why Blair had not shown up. Flint said she told K.E. she did not know why.

Over defense objections, the state was allowed to introduce evidence of four *Spreigl* incidents. They related to Blair's involvement with shoplifting done by teenage girls, automobile theft and forgery. Two incidents happened on February 21, 1989 at Target stores in Crystal and Bloomington. Another incident occurred at the Bloomington Target store on January 17, 1989. The last incident put into evidence happened on February 12, 1988 at the Target store on East Lake Street in Minneapolis and resulted in Blair being arrested.

ISSUES

1. Did the trial court err in admitting *Spreigl* evidence?

2. Did the trial court err in admitting evidence regarding Blair's sexual relationship with K.E. and his threatening K.E.?

3. Do Blair's two convictions violate Minn.Stat. § 609.04 (1988)?

4. Did the trial court err in refusing to submit a lesser included offense to the charge of criminal liability for others' theft over $2,500?

5. Did the trial court err in ordering Blair to reimburse the costs of extraditing him to Minnesota?

6. Did the trial court err in imposing sentences representing double durational departures from the sentencing guidelines?

## ANALYSIS

1. Blair contends the trial court erred in admitting *Spreigl* evidence. *See State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965). We find the trial court did not abuse its discretion. *See State v. DeWald,* 464 N.W.2d 500, 503 (Minn.1991). The trial court properly determined

> (1) that the evidence [was] clear and convincing that [Blair] participated in the *Spreigl* offense[s], (2) that the *Spreigl* evidence [was] relevant and material to the state's case, and (3) that the probative value of the *Spreigl* evidence [was] not outweighed by its potential for unfair prejudice.

*Id.* (citations omitted).

Furthermore, the state showed it needed the *Spreigl* evidence. The state's evidence on identity was weak, with only K.E. and D.L. positively identifying Blair in accomplice testimony that was subjected to significant impeachment. Blair also presented two alibi witnesses. *See id.* at 504 (where identity is in issue and a defendant offers alibi evidence, the state is allowed to use *Spreigl* evidence to bolster its case).

The *Spreigl* evidence also was relevant to show a common scheme or plan. *See State v. Slowinski,* 450 N.W.2d 107, 113 (Minn.1990) (citing *Spreigl,* 272 Minn. at 491, 139 N.W.2d at 169). The evidence was of bad acts markedly similar in modus operandi to the charged offenses and tended to corroborate evidence of the charged offenses. *See State v. Forsman,* 260 N.W.2d 160, 167 (Minn.1977). The *Spreigl* evidence showed Blair had a pattern of exploiting dependency and sexual relationships with teenage girls. It also showed his pattern of reducing his own criminal exposure by recruiting juveniles to do the actual stealing at his direction.

Furthermore, the trial court gave cautionary instructions to the jury before the introduction of evidence of each *Spreigl* incident and at the close of evidence. *See Slowinski,* 450 N.W.2d at 114.

2. Nor did the trial court abuse its discretion in admitting evidence regarding Blair having sex with K.E. and threatening her. There was clear and convincing evidence of Blair's participation, the evidence was materially relevant and its probative value outweighed its prejudicial effect. *See* Minn.R.Evid. 404(b); *DeWald,* 464 N.W.2d at 503.

The trial court allowed evidence that Blair had K.E. perform oral sex on him in the truck on the way up to St. Cloud, assaulted K.E. with a gun during the trip and wanted D.L. and K.E. to engage in sexual activity with each other while he watched when they were in the motel. These incidents showed Blair's manipulation of the girls, their motivation to steal for him and also gave further evidence of his modus operandi.

Furthermore, the inconsistent statements given by the two girls primarily concerned evidence of sexual activity and threats occurring on November 11, 1989. The evidence gave a context to D.L.'s initial claim, later retracted, that Blair had forced her to have sex by threatening her with a gun.

3. Blair contends his two convictions violate Minn.Stat. § 609.04 (1988). We agree.

Minn.Stat. § 609.04, subd. 1 (1988) provides:

> Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both. An included offense may be any of the following:
>
> (1) A lesser degree of the same crime; or
>
> \* \* \* \* \* \*

(4) A crime necessarily proved if the crime charged were proved.

This statute bars multiple convictions for the same offense, or for one offense and a lesser-included offense, based on the *same* criminal act. *State v. Gayles*, 327 N.W.2d 1, 3 (Minn.1982). If multiple convictions are based on the same act, the defendant is entitled to have all but one vacated. *State v. Eppler*, 362 N.W.2d 315, 318 (Minn. 1985).

The prosecutor explained the charges to the jury as follows:

The first count of theft says that [Blair] stole, along with the assistance of those two young women, over $2,500 in merchandise. *That's the merchandise that made its way out of the store without being caught by the security guard.* That's the merchandise that made it into his truck, that he transported down to Minneapolis, and that was ultimately found by the police.

\* \* \* \* \* \*

*The second count is the stuff that Target caught.* Remember, after Holly Kujas stopped [D.L.], she came back to the store and brought that cart that [D.L.] had left outside the front doors back into the store. \* \* \* And the merchandise in that one cart was valued at [$900].

\* \* \* \* \* \*

The Judge will, once again, instruct you that [Blair] is charged with two counts of theft; the first count is over $2,500, and that's for the merchandise that was seized from the [Boardman Street house]; *the property that walked its way out the door in the carts that [D.L. and K.E.] were pushing on the times that they didn't get caught.*

(Emphasis added.)

On appeal, the state contends that it was understood one count was for the first theft that day and the other count was for the second theft on November 11, 1989. We are not persuaded by the state's argument that Blair must have understood the two counts were separately based on the separate forays because Blair did not object to the structure of the charges at trial. Whatever Blair's understanding may have been, what matters is the jury's understanding. Our review of the record shows no one told the jury it should find Blair guilty of theft over $2,500 for the first theft and theft over $500 for the second theft. The trial court, in its instructions, only said that the two separate counts occurred on November 11, 1989, not that they occurred at two separate times.

There were two different acts here, the two separate shoplifting forays. Nonetheless, Blair was not convicted for two separate acts. His conviction was based on two separate seizures of stolen property. The evidence shows K.E. got away with a shopping cart on the second trip in addition to the first.

By telling the jury to base the convictions on when property was seized, the state asked the jury to base the two convictions on one criminal act. The state told the jury to base the count for theft over $500 on the stolen items in the cart seized from D.L. after the second foray. The state told the jury the count for theft over $2,500 covered the property that was successfully stolen. The evidence showed, however, that K.E. got away with a cart during the second trip. Therefore, the state based the greater charge on the two separate incidents. It necessarily follows, then, that the lesser charge was based on an incident which had already given rise to a conviction.

■ The state argues that, even if it might be proper to vacate the lesser conviction, we should not do so because Blair waived the issue by not asking the trial court to vacate the second conviction prior to this appeal. *See State v. Gonzalez*, 407 N.W.2d 472, 477 (Minn.App.1987), *pet for rev. denied* (Minn. July 15, 1987); *State v. Packard*, 366 N.W.2d 721, 725–26 (Minn. App.1985), *pet. for rev. denied* (Minn. July 17, 1985) (this court "will not determine whether a conviction should be vacated unless the issue is first presented to the trial court") (citing *Ture v. State*, 353 N.W.2d 518, 522–23 (Minn.1984); *State v. Kemp*, 305 N.W.2d 322, 326 (Minn.1981)). Failure

to first raise the issue in trial court does not result in waiver, however.

[*Kemp*] merely indicated that in the future we might decline to decide issues concerning the application of either section 609.035 or 609.04 unless the defendant first presented it to the trial court for decision. The intent of that language was to get defense counsel to petition for relief in the district court first, thereby possibly avoiding the need for an appeal * * *.

\* \* \* \* \* \*

* * * The intent of the language was not to suggest that a defendant waives or forfeits the issue if he does not raise it at the time of sentencing.

*Ture,* 353 N.W.2d at 523.

Where, as here, the evidence is clear the jury was improperly told that property stolen in one criminal act could support two convictions, there is nothing to be gained by requiring Blair to now seek post-conviction relief in the trial court on this issue. In the interest of justice, we reach the issue and order Blair's conviction for criminal liability for others' theft over $500 be vacated.

Because we have vacated the second conviction, we do not reach Blair's contention that sentences for both convictions violate Minn.Stat. § 609.035 (1988).

■ 4. Blair contends the trial court erred in refusing to submit a lesser included offense to the charge of criminal liability for others' theft over $2,500. In light of our vacation of the second conviction, we find that, if there was error, it was harmless.

The testimony of K.E., D.L., security officer Kujas and A.P. is sufficient to support a conviction for criminal liability for others' theft over $2,500. That testimony shows that the cartful of stolen property with which K.E. got away in the second trip was worth $900. The testimony also shows the stolen property in the two shopping carts with which K.E. and D.L. got away in the first trip had a greater value. Therefore, the jury could find beyond a reasonable doubt that the three shopping carts contained merchandise worth at least $2,700.

Blair argues the jury might have been led to presume that all of the property found at the Boardman Street house was stolen on November 11, 1989. He contends that, while the larger items were identified as coming from St. Cloud and having a value of more than $3,000, the question of when the goods were stolen remains unanswered. The jury, however, was made aware that some items had been stolen from the St. Cloud Target previously. Additionally, the state introduced testimony of K.E. in which she indicated what items were stolen on November 11, 1989 and what items were stolen earlier.

■ 5. Blair claims the trial court erred in ordering him to reimburse the costs of extraditing him to Minnesota because a statutory amendment authorizing collection of extradition costs did not take effect until after he was extradited. *See* Minn.Stat. § 631.48 (1990). Therefore, he asserts, it is ex post facto as applied to him. We disagree. The purpose of the statute is "reimbursement of the state rather than punishment of the defendant." *State v. Niemczyk,* 400 N.W.2d 401, 404 (Minn.App. 1987) (citing *State v. Morehart,* 149 Minn. 432, 433, 183 N.W. 960 (1921)).

Furthermore, the effect of the collection of extradition costs here does not make the punishment of the crime more burdensome. *See Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977). Rather, any increased punishment is attached to Blair's flight.

■ We are troubled, however, that the trial court did not make a finding Blair has the ability to reimburse the costs. *See Niemczyk,* 400 N.W.2d at 404; *State v. Martinson,* 460 N.W.2d 342, 344 (Minn. App.1990), *pet. for rev. denied* (Minn. Oct. 25, 1990) (rejecting argument appeal of fine levied on a defendant without finding ability to pay is premature so long as defendant is incarcerated on executed sentence). We remand for a finding of ability to reimburse.

6. Finally, Blair argues the trial court erred in imposing sentences representing double durational departures from the sentencing guidelines. We find no error as to the sentence for the conviction we have left standing.

As a general rule, it is improper to consider evidence of other offenses with no bearing on the seriousness of the manner in which the current offense was committed; however, a court may properly consider the course of conduct underlying the offense for which sentence is being given. *State v. Cermak,* 344 N.W.2d 833, 837 (Minn.1984).

Blair argues shoplifting is not a "major economic offense" deserving of departure. *See State v. Gross,* 332 N.W.2d 167, 170 (Minn.1983). Nonetheless, departure may be justified "if the conduct underlying the offense is substantially more serious than that typically associated with the commission of the offense." *State v. Myers,* 416 N.W.2d 736, 738 (Minn.1987) (citation omitted).

The trial court noted Blair had accomplished his criminal objectives through exploitation of particularly vulnerable runaway juvenile girls by use of sex, coercion, emotional blackmail and, at least once, threat of harm while brandishing a gun. We find these reasons support a double departure.

## DECISION

Affirmed as modified and remanded.