STATE of Minnesota, Respondent,

v.

Kelly Jean RITT, Appellant.

No. C9–98–114.

Supreme Court of Minnesota.

Aug. 5, 1999.

Rehearing Denied Sept. 3, 1999.

John M. Stuart, State Public Defender, Bradford S. Delapena, Asst. State Public Defender, Minneapolis, for appellant.

Michael A. Hatch, Atty. Gen., St. Paul, James C. Backstrom, Dakota County Attorney, Lawrence F. Clark, Scott A. Hersey, Asst. Dakota County Attorneys, Hastings, for respondent.

## OPINION

STRINGER, Justice.

Twenty-three-month-old Hannah Ritt died in her crib when a fire occurred in her home on March 25, 1997. Death was caused by toxic fumes released from the burning of an acrylic afghan. Six days later Hannah's mother, appellant Kelly Jean Ritt, spoke with Detective James Rgnonti of the Hastings Police Department and admitted tossing an afghan from Hannah's crib toward a daybed in the room and not moving it when it landed partially on a space heater on the floor. Ritt denied "wanting" to cause a fire or kill Hannah but admitted "hoping" that Hannah would die. Ritt was arrested and subsequently indicted on two counts of first-degree murder,[1] two counts of second-degree murder,[2] one count of third-degree murder[3], one count of second-degree manslaughter,[4] and one count of first-degree arson.[5] She was convicted of all charges except manslaughter following a month-long jury trial in Dakota County in which 48 witnesses testified. Ritt asserts three issues on appeal: (1) that her statement to Rgnonti was involuntary and inadmissible because she was subjected to "psychological interrogation"; (2) that the trial court erred in excluding expert testimony describing police interrogation practices; and (3) that the trial court erred in admitting a videotaped "test burn" involving an afghan and a space heater similar to those involved in the fire in Hannah's room. We affirm Ritt's conviction.

### I.

Hannah Jean Ritt was born on April 5, 1995, the third child of Kelly and Brian Ritt.[6] Although Kelly Ritt's pregnancy had appeared normal, Hannah was born with cytomegalovirus (CMV), a virus that affected her heart, liver, spleen, hearing, eyesight and brain. While some of Hannah's conditions improved over time, Hannah remained unable to eat without experiencing reflux, or regurgitation, and required four to six feedings of a liquid formula each day through a gastrostomy tube. The tube required frequent cleaning to avoid infection. Hannah was also deaf and developmentally delayed, and it was unclear at the time of her death whether she would experience any long-term mental deficiency. Hannah required the assistance of a large number of caregivers, including public health nurses, a physical therapist, a speech therapist, and sign language teachers, as well as in-home personal care attendants.

One of Hannah's care providers was her grandmother, Judith Doffing, who told the fire marshal during his investigation that she rocked Hannah to sleep on the night of the fire. Doffing testified at trial that after putting Hannah to bed she smoked a cigarette in the kitchen before she went home but did not take a cigarette into any other room of the house that evening. According to the testimony of Doffing and others, smoking was confined to the kitchen of the house.

The state presented testimony that Ritt had told several friends that she wished Hannah would die. Ritt repeatedly asked a large number of people if they would be

---

1. Minn.Stat. § 609.185(1), (3) (1998) (premeditated; while committing arson in the first degree).

2. Minn.Stat. § 609.19, subds. 1(1), 2(1) (1998) (intentional; while committing a felony).

3. Minn.Stat. § 609.195(a) (1998) (depraved mind).

4. Minn.Stat. § 609.205(1) (1998).

5. Minn.Stat. § 609.561, subd. 1 (1998) (dwelling).

6. Ritt's daughter, K.R., was approximately 8 years old, and her son, G.R., was 5 years old when Hannah was born. Ritt gave birth to a healthy baby boy, J.R., 10 months after Hannah was born.

interested in adopting Hannah, but also voiced the opinion that her husband would never allow it. Testimony from those involved in Ritt's life indicated that she had participated in at least two conversations about the potential dangers of space heaters. Ritt had asked a family member whether a blanket placed over a space heater could cause a fire and was told it could.

The fire marshal in charge of investigating the fire in the Ritt home determined the origin of the fire to be either the front of the electric space heater or at floor level in front of the heater, and that the fire then spread to the daybed behind the heater. The front grille of the heater melted from the heat of the fire and a pattern of hard crusty ash material was found on top of the heater and on the floor in front and back of the heater. The fire marshal testified that in his experience this kind of ash was produced by the burning of synthetic fabrics such as acrylic. The carpet in front of the heater and the underlying pad were burned through to the hardwood floor. There were smudges in the soot on the wall at the foot end of the crib that appeared to be finger marks.

The fire marshal testified that Ritt told him that smoking was not allowed in Hannah's room because of her medical problems and no evidence of matches, lighters, cigarettes or ashtrays was found in any room of the house other than the kitchen. A test of the air in Hannah's bedroom the morning after the fire revealed no trace of combustible fumes, and analysis of samples of the carpet in three locations failed to disclose the presence of accelerants. The fire marshal testified that this did not rule out the presence of accelerants however, since some chemicals evaporate quickly and would not be detectable after the fire. The fire marshal also testified

that Ritt told him that Hannah had recently started throwing things out of her crib.

Over a standing objection by the defense, four videotaped test burns involving an afghan and a space heater were played for the jury during the testimony of the state's electrical expert witness. The court gave a cautionary instruction to the jury that the videotapes were "offered solely to demonstrate the scientific principles which may serve as a basis for this expert's opinion" and were "not offered to recreate the fire that allegedly occurred at the Ritt home." The test burns involved a heater similar to the one found in the Ritt home set to its maximum wattage for the duration of each of the four test burns. The first two tests involved an afghan taken from J.R.'s bed which was described by Doffing and the Ritts as similar to Hannah's.[7]

For the first test J.R.'s afghan was draped over the exemplar heater for 80 minutes, the maximum length of time the afghan could have been on the heater on the evening of the fire. The afghan browned slightly but did not burn and there was no damage to the grille of the heater or the carpet underneath. The second test involved bunching up the afghan in front of the heater in an attempt to increase the heat to the grille. Those who were present for the second test were driven out of the room after about 15 minutes because of the acrid choking fumes emitted by the afghan. The afghan charred and pulled away from the heater, but the heater grille did not melt. A test was also conducted on a piece of carpet taken from Hannah's bedroom and was ignited with a propane torch, but the fire extinguished when the torch was removed.

The state's expert concluded from the first two test burns that the fire in the Ritt

---

7. J.R.'s afghan was determined to be 100% acrylic, which when burned produces a hard crusty ash. A textile flammability expert testified that the ash found around the heater in the Ritt home was inconsistent with any fiber material other than acrylic, and that it was

"virtually impossible to ignite acrylic fibers from a smoldering heat source, such as a cigarette" because acrylic gets larger when heated and forms a hard char of carbon which is resistant to fire and flame.

home involved an outside source of ignition and an accelerant because he could not duplicate the damage to the grille and the carpet with the burning afghan alone, so follow-up tests were conducted. In the third test burn an acrylic afghan was draped over the exemplar heater and a low shelf to recreate the location of the daybed, and the afghan was ignited in two places by a paper match. The grille did not melt and although the top layer of the carpet was charred, the carpet did not burn through to the floor, as occurred in the fatal fire. For the fourth and final test burn the afghan was draped over the heater and between one pint and one quart of acetone [8] was poured onto the afghan, heater and underlying carpet. The afghan was then ignited with a propane lighter. The heater grille melted and the carpet burned through in a manner similar to the scene of the fire.

Detective Rgnonti testified that he interviewed Ritt at the Hastings Police Station on April 1, 1997. Rgnonti had earlier told Ritt's family that he wished to speak with her and Ritt had called him on the morning of April 1 to schedule the interview at a time that was convenient for her. The interview between Rgnonti and Ritt took place in Rgnonti's office in the administrative section of the police building. Rgnonti was not in uniform during the interrogation and was not carrying his service weapon. The door was closed because there was a broadcast speaker just outside his office that was sometimes noisy. Rgnonti testified at length about the interview and a videotape of both the interview and formal statement were played for the jury.

Initially Rgnonti informed Ritt that "nobody [was] under any type of arrest at all" and she was free to go when they had finished talking. Ritt then proceeded to tell Rgnonti that on the evening of the fire she was asleep in her bed with her two oldest children, K.R. and G.R., and that the smoke alarm woke her.[9] According to Ritt, Hannah uttered one scream almost simultaneously with the smoke alarm. Ritt woke the sleeping children and went to Hannah's room but "couldn't get in." She stated that the door to Hannah's room was open a crack and that she pushed the door open further and could see the crib, flames, and a lot of smoke. She said she could not see Hannah but her "feeling" was that Hannah was standing up. Ritt said she then ran to the kitchen, accompanied by K.R., and called 911. Ritt stated that she tried to get into Hannah's room several times after sending her three older children to a neighbor's house but was unable because she had difficulty pushing the door open and could not breathe because of the smoke. She eventually ran outside to get some fresh air and flagged down the responding police officer.

Ritt told Rgnonti what she had earlier told the fire marshal – that Hannah had recently begun to throw things out of her crib and had done so five or six times, and that Hannah's afghan had landed on the heater in the past and had browned but not burned. Ritt characterized Hannah's afghan as similar to J.R.'s but larger and without fringes.

Ritt's account of the fire changed over the course of her interview with Rgnonti. Rgnonti expressed doubt about Hannah's ability to throw the afghan as far as the

**8.** There were no empty accelerant containers discovered in the Ritt home immediately after the fire, but there was evidence that fingernail polish remover, which contains acetone, was kept in the home.

**9.** K.R.'s trial testimony contradicted some elements of Ritt's account of the evening. K.R. testified that on the evening of the fire she and her brother G.R. read books in her mother's bed while her mother watched TV in the living room. K.R. fell asleep after G.R. did but before her mother came into the bedroom. K.R. testified that she was woken by her mother, who was standing next to the bed shaking her and telling her "there's a fire." K.R. also testified that when she was standing behind her mother in the doorway to Hannah's bedroom there was "not very much" heat or smoke coming from the room.

space heater and asked Ritt whether she had gone in to check on Hannah and remove the afghan. Ritt eventually admitted that she went into Hannah's room prior to the fire and took the afghan off Hannah. She tossed the afghan toward the daybed and stated that it "probably" landed partially on the heater. Ritt denied placing the afghan on the heater "on purpose," but that she might have done so "on hope," and that sometimes she wished that God would decide to take Hannah. She repeated her assertion that she attempted to enter Hannah's room to save her but was prevented by the choking smoke.

Following her interview Ritt was read her Miranda rights and agreed to give a formal statement to Rgnonti about the night of the fire. She repeated the substance of her earlier interview stating that she removed the afghan from Hannah and threw it toward the daybed and thought it had landed partially on the heater. She stated that later when she heard the smoke alarm she thought "Look what I did now." Ritt continued to draw a distinction between what she wanted to happen and what she hoped might happen: for example, she stated that she did not intend for Hannah to die, yet she "hoped" that God would take her. Ritt eventually stated that she was sure part of the afghan landed on the heater but that she did not see it and could not understand how a space heater could cause a fire. At the end of the statement Ritt stated that she had given the statement freely and that she was not coerced. The videotape continued to record Rgnonti and his supervisor telling Ritt that they were going to charge her with Hannah's death and allowing her to call her husband to come down to the police station.

Ritt's daughter K.R. spoke with two police officers on April 1, 1997, the day of Ritt's interview with Rgnonti, and told them that she was behind her mother at the door to Hannah's room shortly after the smoke alarm sounded and saw Hannah at the foot of the crib with her arms outstretched. K.R. testified that she told the officers that Hannah had given a little scream, "the kind of scream she makes when she's in danger." At trial however, K.R. denied seeing Hannah in the crib. K.R.'s uncle testified that she told him on April 2, 1997 that when she stood behind Ritt at the door to Hannah's room there was little smoke and she could see some flames and Hannah standing in her crib. K.R. told her uncle that Ritt closed the door and told K.R. to wake her brother G.R.

Rgnonti was subjected to a lengthy cross-examination by defense counsel about his training in interrogation and the techniques he used during Ritt's interview. Rgnonti stated that he had attended a Continuing Legal Education seminar on the Inbau, Reid & Buckley technique ("Reid technique") of interrogation in 1993 and attended a refresher course in December of 1996. Rgnonti disagreed with defense counsel's assertion that the second course was "advanced" however, stating that it was "very similar" to the first and included the same videotapes.

The state's theory of the case was that Ritt draped the afghan over the heater and daybed, poured nail polish remover over it and ignited it. The defense's theory was that the fire was caused by a lit cigarette which had burned into the mattress of the daybed. The defense's electrical expert witness testified that in his opinion no accelerant was present and the damage to the grille and other parts of the heater was caused by the combination of heat from the afghan, the heater, and the burning daybed in a small room. The defense expert did not run any independent tests however, and he did not disagree with the results of the first two tests of the afghan performed without an accelerant. He also agreed with the state that the damage to the heater was caused by an external heat source in front and on top of the heater.

The defense also called a fire expert who testified that the point of origin of the fire was at or near the floor level between the daybed and the dresser and that it was caused by an accidentally discarded cigarette that burrowed into the foam mattress of the daybed. He further testified that no accelerant was used because ignition of the fumes would have burned anyone standing close enough to light the afghan and would have caused the room to be rapidly engulfed in flame.

The jury was instructed and began deliberations on October 16, 1997. Within a few hours the jury requested to view the videotapes of Ritt's interview and formal statement. Without objection from either counsel the jury was permitted to review both videotapes out of the presence of the court and counsel and to stop the videotapes when they wished to discuss them among themselves. The jury returned a verdict on October 18, 1997, finding Ritt guilty of two counts of first-degree murder, two counts of second-degree murder, one count of third-degree murder, and one count of first-degree arson, and acquitting Ritt of one count of second-degree manslaughter. Ritt was sentenced to life imprisonment on the conviction of first-degree premeditated murder and the court stayed adjudication on the remaining convictions.

## II.

Ritt's first claim on appeal is that the trial court erred when it denied her pretrial motion to suppress the statement she gave to Rgnonti because it was involuntary and hence inadmissible. Ritt argues that Rgnonti improperly used her grieving and guilt as well as her lack of sleep to coerce her into agreeing with a scenario suggested by Rgnonti. In its order denying the motion to suppress, the trial court commented that Ritt "appeared [in the videotape] to be very alert and was able to carry on a detailed conversation with Rgnonti without any indication of mental or physical impairment" and also noted that Ritt disagreed adamantly with Rgnonti on certain points. The trial court also remarked that Ritt was given soft drinks and allowed to smoke throughout the interview.

Ritt argues that her interview and formal statement were the product of a technique of psychological interrogation that can and does induce innocent people to confess. She asserts that the Reid technique of interrogation systematically alters the suspect's perception of reality through an elaborate web of implicit threats and promises until the suspect believes that confession is the best alternative, even though he or she is innocent of the crime.

We review the voluntariness of a confession de novo as a question of law based on "all factual findings that are not clearly erroneous." *State v. Anderson*, 396 N.W.2d 564, 565 (Minn.1986). The voluntariness of a statement or confession depends on the totality of the circumstances. *See State v. Patricelli*, 357 N.W.2d 89, 92 (Minn.1984); *State v. Jungbauer*, 348 N.W.2d 344, 346 (Minn.1984). Relevant factors include the defendant's "age, maturity, intelligence, education and experience," as well as the defendant's ability to comprehend. *Jungbauer*, 348 N.W.2d at 346 (citing *State v. Linder*, 268 N.W.2d 734, 735–36 (Minn.1978)). The nature of the interrogation is also relevant, including its length and surrounding circumstances, and whether the defendant was denied any physical need or access to friends. *See id.* (citing *Linder*, 268 N.W.2d at 735–36). A statement is involuntary if police actions were so coercive, manipulative and overpowering as to "deprive[ ] [a suspect] of his ability to make an unconstrained and wholly autonomous decision to speak as he did." *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991). We look with disfavor upon both implied and express promises made during an interrogation by police but such promises do not automatically render a confession involuntary. *See State v. Thaggard*, 527 N.W.2d 804, 808–11 (Minn. 1995); *Jungbauer*, 348 N.W.2d at 346.

In *Thaggard* we examined the issue of police deception during interrogation referencing the Reid technique and the Model Code of Pre–Arraignment Procedure (1975). *Thaggard,* 527 N.W.2d at 808–810. The court disapproved of the conduct of a police officer who promised the defendant that he would probably be given drug treatment if he confessed "up front what happened," but held the resulting confession to be voluntary because the defendant understood the *Miranda* warning, "had prior experience with the criminal justice system * * *; was interrogated early in the afternoon for a relatively short period of time; the interrogation was conducted by only one officer; [the] defendant was permitted to take a break and use the bathroom," and there was no indication of any intoxication, threats, or physical intimidation *Id.* at 807, 810–12. We stated:

> The key factor, however, is the fact that there is no indication that [the] defendant was led to believe that he would not be prosecuted for the rape if he confessed. The record indicates that [the] defendant may have been led to expect that he would receive treatment but he was not led to expect that the treatment would be instead of prosecution and punishment.

*Id.* at 812.

In *Pilcher* the defendant alleged that statements admitted in evidence "were the product of police coercion." 472 N.W.2d at 330. The interrogation was conducted in the kitchen of the law enforcement center by two officers and the interrogating officers techniques included a "sympathetic approach," confronting the defendant with evidence against him, and informing him of possible punishments. *Id.* at 333–34. We held that the confession was not involuntary despite the defendant's emotional breakdown:

> While an emotionally distressed defendant should be allowed to become composed before making a confession, this concern arises where an accused's emotional state threatens the accused's ability to freely and voluntarily make inculpatory statements. Pilcher's emotional breakdown does not detract from the coherence and responsiveness he displayed throughout the interrogation where, despite his "emotional breakdown," Pilcher repeated the fiction of there being a "big Mexican guy" in the car. That he adhered to this woven tapestry of lies shows that Pilcher's will was not overborne.

*Id.* at 334 (citations omitted). The court concluded that the defendant "understood the shadow of suspicion in which he stood and was not deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did." *Id.*

The defendant in *State v. Slowinski,* 450 N.W.2d 107 (Minn.1990), alleged that a statement admitted at trial was involuntary because of promises of leniency as well as psychological coercion. *See id.* at 111. We disagreed, pointing to the circumstances surrounding the interrogation: it was videotaped and made available to the court; it lasted approximately four hours with intermittent breaks; the defendant was read his Miranda rights at the outset and was allowed to smoke, drink soft drinks, use the restroom, and call his wife; the defendant indicated that he was willing to talk; and the defendant was "lucid and appeared to understand what was at stake in the investigation." *Id.* Although the police may have improperly suggested that they would advocate for psychiatric help and could influence the charges against the defendant, we held that the statements of the police, "though improper, were not the kind of statements that would make an innocent man confess." *Id.* at 112 (citing *Jungbauer,* 348 N.W.2d at 346–47).

■ Reviewing carefully the totality of the circumstances surrounding Rgnonti's interview of Ritt, we conclude that her statement was not coerced. Ritt came to the interview following a session with her counselor but she herself had scheduled the time of the interview. It was held in

Rgnonti's office and he was not armed or in uniform. Ritt was not initially informed of her *Miranda* rights but she was told that she was not under arrest and would be free to leave after the conversation. She was allowed to smoke freely even though the law enforcement center was a no-smoking facility, and Rgnonti left the room to get her a soft drink when she asked for one. Ritt gave no indication of being overly tired or under the influence of any medication and never indicated to Rgnonti that she was under any particular stress. She did not cry or break down emotionally, and when she spontaneously asked Rgnonti if she would still have been considered a suspect if she had cried, he told her yes.

Ritt appeared to have the ability to accurately verbalize her feelings and made sure that Rgnonti did not overstate what she said. She disagreed with Rgnonti on certain points and repeatedly denied intentionally placing the blanket on the space heater in order to cause a fire. She asked a number of questions about her status as a suspect and wondered out loud whether the insurance company would pay for the damage caused by the fire. Following her formal statement Ritt was asked if she had spoken of her own free will. She answered yes. Ritt was allowed to call her husband, who came to the police station and was informed of Ritt's statement and arrest.

■ The test for an involuntary statement is whether police conduct would have overborne the will of an innocent person. *See Jungbauer*, 348 N.W.2d at 347. Although the interrogation may have been unpleasant for Ritt, there is little indication that her will was overborne, particularly since she continued throughout the interview and formal statement to deny any intent to place the blanket over the heater to cause a fire. Under the totality of the circumstances we are satisfied that Ritt's will was not overborne and hold that her interview and statement were voluntary and admissible as evidence against her.

## III.

Ritt next argues that the trial court erred when it excluded the testimony of Dr. Ralph Underwager about the reliability and effect of the Reid technique of interrogation. The defense submitted an offer of proof to the court and proposed to have Underwager take the jury through the videotape of Ritt's interview with Rgnonti to point out the use of specific interview techniques to illustrate how Rgnonti coerced Ritt into adopting certain statements. The court suppressed Underwager's testimony, stating:

> [I]n this case the court makes a finding that the testimony would exceed the bounds of Rule 702, expert testimony. And under Rule 403 there's an extreme danger that it could confuse the jury. It appears to this court that this purported expertise does nothing more at this time than offer the gratuitous opinion of an expert with respect to the credibility of certain evidence that may be admitted here. And the jury would be in the best position to review all the video and the testimony – and the witnesses will be subject to cross-examination – on their own, without the assistance of an expert to make that [de]termination of credibility and does not * * * need an expert to do that.

Ritt argues that the jury could understand the dynamics of the interview and formal statement only if the underlying interrogation technique was explained.

■ The admission of expert testimony is within the broad discretion accorded a trial court, *See State v. Miles*, 585 N.W.2d 368, 371 (Minn.1998), and rulings regarding "materiality, foundation, remoteness, relevancy, or the cumulative nature of the evidence" may be reversed only if the trial court clearly abused its discretion. *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 725 (Minn.1983). Admissibili-

ty of expert testimony is governed by Minn. R. Evid. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Evidence "helpful to the jury in fulfilling its responsibilities" is admissible. *Miles*, 585 N.W.2d at 371.

> The basic requirement of Rule 702 is the helpfulness requirement. If the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience, then the testimony does not meet the helpfulness test.

*State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn.1980). The trial court may also scrutinize the proffered expert testimony as it would other evidence, balancing its relevance against the danger of unfair prejudice, the potential for confusing the issues or misleading the jury, or other concerns. *See* Minn. R. Evid. 403; *Miles*, 585 N.W.2d at 371.

■■■■ Expert testimony that does not add either "precision or depth to the jury's ability to reach conclusions about [a] subject which is within their experience" does not meet the helpfulness test and the trial court is within its discretion to exclude it. *Helterbridle*, 301 N.W.2d at 547. Assessment of credibility is ordinarily within the understanding of a lay jury:

> With respect to most crimes the credibility of a witness is peculiarly within the competence of the jury, whose common experience affords sufficient basis for the assessment of credibility. In most cases, even though an expert's testimony may arguably provide the jury with potentially useful information, the possibility that the jury may be unduly

influenced by an expert's opinion mitigates against admission. Nor should the credibility of witnesses in criminal trials turn on the outcome of a battle among experts.

*State v. Myers*, 359 N.W.2d 604, 609–10 (Minn.1984).

■■■■ Expert testimony is helpful and admissible if it explains a behavioral phenomenon not within the understanding of an ordinary lay jury, such as battered woman syndrome or the behavior of sexually abused children. *See State v. Hennum*, 441 N.W.2d 793, 798 (Minn.1989); *Myers*, 359 N.W.2d at 609–10. There are limitations to the reach of this type of expert testimony, however. Testimony on battered woman syndrome is limited to a description of the syndrome's general nature and the expert is not allowed to testify whether a particular defendant or witness suffers from the syndrome because the expert testimony may be perceived as evidence on the ultimate issue of guilt or innocence, *see Hennum*, 441 N.W.2d at 799, or as an "unwarranted 'stamp of scientific legitimacy' to the testimony." *Myers*, 359 N.W.2d at 611 (quoting *People v. Izzo*, 90 Mich.App. 727, 282 N.W.2d 10, 11 (1979)); *see also State v. Grecinger*, 569 N.W.2d 189, 196–97 (Minn.1997); *Id.* at 199 (Stringer, J., concurring).

We have held it within the discretion of a trial court to exclude expert testimony on the frailties of eyewitness identification, *see Miles*, 585 N.W.2d at 371–72; *Helterbridle*, 301 N.W.2d at 547, and that a trial court was within its discretion to exclude testimony about the personality characteristics of a defendant which were "nothing more than a composite of personal characteristics that might render an individual more susceptible to wanting to please an authority figure" and the jury "was fully capable of observing and understanding" the defendant's behavior. *Bixler v. State*, 582 N.W.2d 252, 254, 256 (Minn.1998).

■■■■ Ritt points to *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d

636 (1986), for the principle that a defendant has a right to present "competent reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Id.* at 690, 106 S.Ct. 2142. The circumstances here are far different from those in *Crane,* however. In *Crane,* the trial court excluded evidence regarding the physical surroundings and circumstances of a confession by a 16–year old defendant alleged by the defense to have been "badgered" into confessing by as many as six police officers surrounding him during a lengthy unrecorded confinement in a windowless room. *See id.* at 685–86, 106 S.Ct. 2142. The state's case against the defendant rested almost entirely on the unrecorded confession. *See id.* at 685, 106 S.Ct. 2142. Here, Ritt's admission to Rgnonti that she hoped that Hannah would die was corroborated by several witnesses who testified that Ritt expressed the same hope to them. Further, Ritt's entire interview and formal statement were videotaped and the jury could observe the surrounding physical environment and circumstances.

This court has been very reluctant to allow experts to testify about matters that are generally for the jury's determination and are susceptible to cross-examination. As in *Bixler,* the jury here had sufficient information to evaluate Ritt's claim that the Reid technique is coercive enough to make an ordinary innocent person confess. Under the circumstances, the jury had ample opportunity to evaluate the veracity of Ritt's statements to Rgnonti and the trial court did not err in concluding that expert testimony was unlikely to add either precision or depth to their evaluation. We conclude that the trial court was within its discretion in excluding the expert testimony of Dr. Underwager.

## IV.

Finally, Ritt claims that the trial court erred in failing to suppress the videotape evidence of test burns of an exemplar af-ghan on a space heater similar to that involved in the Ritt fire. The videotape was offered in conjunction with testimony by the state's expert on the likely cause of the fire. The defense argued that the conditions of the test burns were not sufficiently similar to those in the actual fire and that the evidence was unfairly prejudicial. The trial court denied the motion to exclude the videotaped test burns concluding that given the limited amount of available information, the testing conditions were sufficiently similar to the conditions of the fire and any prejudice was mitigated by the ability of the defense to cross-examine the state's expert.

 The admission or exclusion of evidence of experiments conducted outside the jury's presence is within the broad discretion of the trial court and will not be reversed absent a clear abuse of discretion. *State v. Johnson,* 291 Minn. 407, 412, 192 N.W.2d 87, 91 (1971). Evidence of an experiment conducted out of the presence of the jury is admissible if the experiment is "made under conditions and circumstances substantially similar to those existing in the case at issue." *State v. DeZeler,* 230 Minn. 39, 49, 41 N.W.2d 313, 320 (1950). The requirement of similarity is somewhat flexible but is strictly applied when the experiment attempts to replicate an event to show that things could, or could not, have occurred as alleged. 1 *McCormick on Evidence* § 202, at 863 (John William Strong ed., 4th ed.1992). No event can be perfectly reenacted however, and dissimilarities that are neither material nor misleading do not bar admission of experimental evidence. *DeZeler,* 230 Minn. at 50, 41 N.W.2d at 320.

We have upheld admission of an expert opinion about the cause of a fire where an experienced fire marshal testified that an accelerant was used even though there was no physical evidence of the presence of an accelerant except for the degree of destruction caused by the fire. *State v. Kolander,* 236 Minn. 209, 217–18, 52 N.W.2d 458, 463 (1952). The opinion was

based on "[t]he fact that it takes an intense fire" to cause the damage observed, and the fire marshal's 19 years of experience "investigating fires of incendiary origin." *Id.* at 218, 52 N.W.2d at 463. The expertise of arson investigators was implicitly held to be an adequate foundation on which to admit an opinion of the cause of a fire in *State v. Hansen*, 286 Minn. 4, 174 N.W.2d 697 (1970), when we stated:

It was proper to allow the arson investigators, whose qualifications as experts are not questioned, to give their opinion of the origin of the fire since such opinion related to a matter apparently not within the common knowledge or experience of the jury and would aid them in deciding the case.

*Id.* at 8, 174 N.W.2d at 699.

 Two experts testified for the state on the origin and cause of the fire. The state fire marshal testified that his investigation of the Ritt fire lead him to the conclusion that the fire began in the front of the space heater, possibly at the floor level, when the heater was partially covered by a synthetic afghan. The test burns were admitted as part of the testimony of the state's electrical expert as part of his investigation into how the Ritt's space heater could have caused such a fire and how the fire could have so severely damaged the heater's metal element. Evidence of the test burns was offered as the basis for the expert's opinion that an accelerant was used and to illustrate ways the fire could not have started. The fire marshal and the electrical expert were both cross-examined at length about the basis of their opinions and the lack of evidence of an accelerant.

Ritt appeals the admission of evidence of only the last of the test burns, arguing that there was improper foundation laid to justify use of an accelerant in the test since there was no trace of an accelerant at the scene of the fire. Under *Hansen*, 286 Minn. at 8, 174 N.W.2d at 699, and *Kolander*, 236 Minn. at 217–18, 52 N.W.2d at 463, however, the trial court was within its discretion to admit the electrical expert's opinion that an accelerant was used based on his past experience investigating fires and the earlier test burn results demonstrating the absence of significant fire damage without the use of an accelerant. Many of the details of the fire scene were duplicated for all four test burns and while there were differences between the conditions of the test burns and the fire scene, there is no requirement that the conditions of a replicative test be identical to those in question. They need only be "substantially similar" for the test results to be admissible. Each test burn was conducted using the same type of space heater involved in the Ritt fire, an afghan with the same fiber content as Hannah's, and a portion of the carpet taken from Hannah's bedroom. In addition, the lack of evidence of an accelerant was thoroughly probed during cross-examination. Under these circumstances we hold that the trial court was within its discretion in concluding that the last test burn was performed under conditions "substantially similar" to those of the fire.

V.

In summary, we hold that Ritt's statement to Rgnonti was voluntary and the trial court did not err in admitting it. Further, the trial court acted within its discretion when it excluded the defense's expert testimony on interrogation practices and admitted the state's evidence of a test burn using an accelerant.

Affirmed.