*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2155**

State of Minnesota,
Respondent,

vs.

Ashley Elizabeth Williams,
Appellant.

**Filed August 25, 2014
Affirmed
Chutich, Judge**

Hennepin County District Court
File No. 27-CR-13-3581

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Susan L. Segal, Minneapolis City Attorney, Jennifer Saunders, Assistant City Attorney, Zenaida Chico, Assistant City Attorney, Minneapolis, Minnesota (for respondent)

Christina M. Zauhar, Halberg Criminal Defense, Bloomington, Minnesota (for appellant)

Considered and decided by Halbrooks, Presiding Judge; Ross, Judge; and Chutich, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CHUTICH**, Judge

Appellant Ashley Williams challenges her conviction of driving with an alcohol concentration of .08 or more within two hours of driving. She contends that the district

court erred by admitting evidence of her breath test and that the district court abused its discretion by excluding an exhibit and expert testimony at trial. Because we hold that the district court properly admitted evidence of her breath test and did not abuse its discretion in excluding evidence at trial, we affirm.

## FACTS

On February 2, 2013, at approximately 3:00 a.m., Officers James Golgart and Jeremy Foster of the Minneapolis Police Department were in the Uptown neighborhood of Minneapolis when they saw a car without a working license-plate light follow another car too closely and then change lanes without signaling. The officers tried to stop the car, but the car did not pull over. Officer Golgart used a speaker system and said, "Pull your vehicle to the curb." The driver of the car eventually pulled over, and Officer Golgart walked up to the driver's side door of the car to speak to the driver. The officer identified the driver as appellant Ashley Williams.

While speaking with Williams, Officer Golgart was "immediately overcome by a strong odor of alcohol coming from inside the vehicle" and then "smell[ed] the alcohol coming from her breath." Officer Golgart observed that Williams had "bloodshot and watery" eyes and spoke with "slurred speech." Williams admitted to drinking alcohol earlier in the night and "lost her balance" when she got out of her car. Officer Golgart asked Williams to perform field sobriety tests. The officer observed cues of impairment from Williams's horizontal gaze nystagmus test and saw that Williams "use[d] her arms for balance," "sway[ed] back and forth," and "hopped and slipped a little bit" during the one-legged stand test. Because Officer Golgart believed Williams had been driving

2

under the influence of alcohol, he arrested her and took her to the Minneapolis Chemical Testing Unit.

Officer Golgart's partner, Officer Foster, read Williams the implied-consent advisory. Williams stated that she wanted to contact an attorney. Officer Golgart gave her access to a telephone and local telephone books to contact an attorney. Williams wanted access to her cell phone to retrieve a phone number, but her cell phone battery was dead. She also asked the officers multiple times for access to the internet and to a Chicago telephone book because "her attorney" was in Chicago. They told her several times that internet access and a Chicago telephone book were not available. Officer Golgart told her that the telephone book had phone numbers for local attorneys who were available 24 hours per day.

Williams then called her parents and spoke to them for approximately 20 minutes. Her parents gave her a phone number for an attorney in Minnesota, and Williams called the attorney. No one answered, and she did not leave a message. Williams did not attempt to call an attorney from phone books she was given and made no other phone calls.

After Williams had approximately 27 minutes to contact an attorney, Officer Golgart told Williams that her "time [was] up." Williams felt "pressur[ed]" and did not know that she was "under a time limit." Officer Golgart asked Williams whether she was ready to continue with the implied-consent process, and she responded affirmatively. Officer Golgart asked Williams if she would consent to a breath test, and she repeatedly said that she wanted to contact her attorney in Chicago. Officer Golgart again explained

3

that he did not have out-of-state telephone books. Williams said many times that she was not a lawyer and did not know whether to take the test or not, and Officer Golgart responded that she would need to make the decision on her own. Officer Golgart re-read Williams the portion of implied-consent advisory that explains the attorney-contact opportunity. Officer Golgart again asked Williams whether she was going to take the test, and she said, "I guess, yes."

Officer Golgart used a DataMaster machine to administer the breath test. Officer Golgart is certified in the use of the DataMaster machine. He followed all guidelines in administering the breath test and saw no errors in the testing process. At approximately 4:25 a.m., the test revealed that Williams had an alcohol concentration of .10.

The state charged Williams with fourth-degree driving while impaired and operating a motor vehicle with an alcohol concentration of .08 or more. *See* Minn. Stat. §§ 169A.20, subds. 1(1), 1(5), .27, subd. 1 (2012). Williams moved to suppress evidence of the breath test. After a suppression hearing, the district court denied Williams's motion.

At trial, Officers Golgart and Foster testified about their interactions with Williams, and the district court admitted the result of Williams's breath test into evidence. Williams testified that she had two beers and a vodka cranberry drink before driving, that she was on a "1,000 calorie a day low carb diet," and that she was taking prescription medication when arrested.

4

Erik Johnson, a forensic scientist with the Minnesota Bureau of Criminal Apprehension, testified about how the DataMaster machine measures the alcohol concentration from a person's breath sample. He testified that

> [t]he [DataMaster machine] uses what's called infrared absorption to measure the amount of alcohol in a breath sample. A sample would be provided into the sample chamber that's housed inside the [DataMaster machine]. Once that's in there, an infrared light source will shine infrared light through the sample, through the sample chamber to a detector on the other end, and based on how much of that light leaves the light source [versus] how much actually gets to the detector instrument can then make a determination as to how much ethanol is in that sample.

Johnson stated that infrared-absorption technology is capable of detecting whether other substances are present that may interfere with test results.

Johnson also explained that, in addition to infrared-absorption technology, the DataMaster machine contained fuel-cell technology, which functions as a "secondary technology" to the infrared-absorption technology. Results from the fuel-cell test and the infrared-absorption tests can vary when testing the same sample. Johnson said that the fuel-cell technology was shut off on all DataMaster machines, including the machine used for Williams's test, because of "durability issue[s]."

Johnson testified that Williams gave two breath samples that showed alcohol concentrations of .102 and .103, which means that the reported value from the test was .10. Johnson stated, "No," when he was asked, "Do you have any doubt about the [DataMaster machine] functioning correctly?" He stated that the result from Williams's breath test was "valid."

Williams's counsel attempted to admit the DataMaster machine's usage report through Johnson, which listed Williams's subject samples and test result along with several other samples and results from the same machine. The state objected for lack of foundation and because the document had only been disclosed to the state the morning of trial; the district court sustained the state's objection.

Thomas Burr, a forensic scientist who specializes in forensic toxicology, testified for the defense about the DataMaster machine and its use of infrared-absorption and fuel-cell technology. He explained,

> [Infrared-absorption and fuel-cell technology] can have different results if the sample contains compounds other than alcohol, then you would expect to get different results on an infrared and fuel cell. A fuel cell measures by oxidizing ethanol. It is specific for alcohols. . . . [Y]ou can't just measure with a fuel cell because . . . you can't look at the sample in real time and you can't monitor sampling with a fuel cell, you can only measure the end result of the alcohol concentration. So you have to put another technology with it, like infrared where you can monitor the sample as you're blowing it into the instrument so you know when you delivered a good sample into the instrument. So if you tested it on fuel cell, you would only be testing alcohol. If you test it on infrared, you have the possibility of testing other compounds and you have to design interfering detection symptoms that flag at certain levels of interference. So if you marry the two technologies, then you solve both of your problems because you have specificity and realtime monitoring of the breath as it's blown into the instrument.

Burr testified that the infrared-absorption technology does not only test alcohol and that it measures "interference[s]" the same way it measures alcohol. He elaborated that "[a]n interferent is a compound that is volatile on the breath and absorbs infrared radiation in the same range as ethyl alcohol does and, therefore, can have the potential as

6

being read as ethyl alcohol on the breath test device." He explained that ketones, which are produced when the body does not "have either the insulin it needs to burn carbohydrates for fuel to run your nervous system and your muscles, or your body doesn't have any carbohydrates available to be burned," are interferents that can potentially be measured like alcohol with infrared-absorption technology. He stated that infrared-absorption testing in the DataMaster machine is not accurate "in a case where there are ketones present." The state objected when Williams's counsel asked Burr whether he thought that Williams's breath-test result from the DataMaster machine was accurate; the district court sustained the objection for lack of foundation.

The jury convicted Williams of fourth-degree driving with an alcohol concentration of .08 or more within two hours of driving and acquitted her of fourth-degree driving while impaired. *See* Minn. Stat. §§ 169A.20, subds. 1(1), 1(5), .27, subd. 1. This appeal followed.

### D E C I S I O N

### I.  Pretrial Suppression Motion

Williams contends that the district court erred by denying her motion to suppress because the breath test "was obtained without a warrant," "without [her] valid consent," and "without vindicating [her] right to counsel." The state responds, and we agree, that Williams had ample opportunity to contact an attorney before the breath test and that Williams consented to the test under the supreme court's holding in *State v. Brooks*, 838 N.W.2d 563, 568–72 (Minn. 2013), *cert. denied*, 134 S. Ct. 1799 (2014).

## A.      Right to Counsel

Whether a driver's right to counsel is vindicated is a mixed question of fact and law. *Groe v. Comm'r of Pub. Safety*, 615 N.W.2d 837, 841 (Minn. App. 2000), *review denied* (Minn. Sept. 13, 2000). "Once the facts are established, their significance becomes a question of law for de novo review." *Id.*

A driver has a limited right to counsel before deciding whether to submit to chemical testing under the Minnesota Constitution. Minn. Const. art. I, § 6; *Friedman v. Comm'r of Pub. Safety*, 473 N.W.2d 828, 835 (Minn. 1991). "Whether a person's right to counsel has been vindicated is determined by the totality of the circumstances, including the evanescent nature of alcohol." *Groe*, 615 N.W.2d at 841. The limited right to counsel is vindicated when the officer reads the implied-consent advisory to the driver and the driver frustrates the process by her conduct. *See Kuhn v. Comm'r of Pub. Safety*, 488 N.W.2d 838, 842 (Minn. App. 1992) ("[W]e believe as a threshold matter the driver must make a good faith and sincere effort to reach an attorney."), *review denied* (Minn. Oct. 20, 1992). The implied-consent statute "requires only that the officer allow and facilitate the defendant's right to counsel, not that the officer make sure the defendant has received the best or even proper counsel." *Butler v. Comm'r of Pub. Safety*, 348 N.W.2d 827, 829 (Minn. App. 1984).

In a pretrial order after a suppression hearing, the district court ruled that Williams's right to counsel was fully vindicated because Williams "was provided reasonable attorney-contact time." The district court noted that Williams had 27 minutes of access to a telephone and phone books, that she "did not make sincere efforts to

8

contact an attorney," and that Williams's "inability" to contact an attorney "was not the fault of law enforcement." The record supports the district court's finding that Williams's right to counsel was fully vindicated.

We conclude that Williams had a reasonable amount of time in which to contact an attorney and a reasonable opportunity to do so. She had approximately 27 minutes with free access to a telephone and phone books, but chose to spend about 20 minutes of that time speaking on the phone with her parents, neither of whom is an attorney. She wrote down a phone number for an attorney while talking to her parents, called that attorney without success, and did not leave a message. Williams did not attempt to call other attorneys, even though an officer explained that attorneys in the phone book were available 24 hours per day.

Williams wanted access to the internet to contact an attorney friend in Chicago and wanted a Chicago phone book, but no case law supports the proposition that the right to counsel requires internet access or access to out-of-state phonebooks. *See id.* at 829 (explaining police officers need not "make sure the defendant has received the best or even proper counsel"). She did not attempt to contact a single attorney from the phone book or try to contact more than one attorney. Williams had a reasonable amount of time in which to contact an attorney, and her less-than-vigorous effort to do so is not the fault of the police. *See Kuhn*, 488 N.W.2d at 841–42 ( "[R]efusing to try to contact more than one attorney or giving up trying to contact an attorney is fundamentally different than making a continued good-faith effort to reach an attorney."); *Parsons v. Comm'r of Pub. Safety*, 488 N.W.2d 500, 502 (Minn. App. 1992) (holding that a driver who had 40

9

minutes to contact an attorney, was given a phone book and a telephone, and spent 13 minutes talking to a non-lawyer had a reasonable amount of time to contact an attorney). We hold that Williams's right to counsel was fully vindicated.

### B. Consent

"When reviewing pretrial orders on motions to suppress evidence, we may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence." *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999).

The United States and Minnesota Constitutions guarantee the right to be secure against unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. 1, § 10. Taking samples of a person's blood, breath, or urine is a search under the Fourth Amendment, requiring a warrant or an exception to the warrant requirement. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616–17, 109 S. Ct. 1402, 1412–13 (1989); *Brooks*, 838 N.W.2d at 568. The dissipation of alcohol in the bloodstream is an insufficient reason to justify a warrantless search. *Missouri v. McNeely*, 133 S. Ct. 1552, 1561 (2013). If a person consents to a warrantless search, the search is valid. *Brooks*, 838 N.W.2d at 568.

The state has the burden to show by a preponderance of the evidence that the driver's consent to a search was given "freely and voluntarily." *Id.* To determine whether a person freely and voluntarily consented to chemical testing in implied-consent cases, we must consider "the totality of the circumstances, including the nature of the encounter, the kind of person the defendant is, and what was said and how it was said."

10

*Id.* at 569 (quotation omitted). The "nature of the encounter" includes how the police came to suspect the person was driving while impaired, whether the person was read the implied-consent advisory, and whether the person had the right to consult with an attorney. *Id.*

The existence of a criminal penalty for chemical-test refusal does not unconstitutionally coerce a driver to take a test. *Id.* at 570. A driver may refuse the test and may not be forced to submit to testing, although the driver may suffer a criminal penalty for making that choice. *Id.* The implied-consent advisory makes it clear to a driver "that he ha[s] a choice of whether to submit to testing." *Id.* at 572.

Here, the record demonstrates that Officers Golgart and Foster complied with all of the statutory requirements of the implied-consent law, and the totality of the circumstances shows that Williams consented to taking the breath test. Officer Golgart stopped Williams because she was tailgating another car and changed lanes without signaling. After approaching her car, he smelled the odor of alcoholic beverages coming from the car and saw that Williams had bloodshot, watery eyes. Williams admitted to drinking alcoholic beverages before driving, struggled with balancing herself when she got out of the car and, during field sobriety testing, showed signs of impairment.

After Officer Golgart arrested Williams, Officer Foster properly read her the implied-consent advisory. Williams asked to speak to an attorney and had 27 minutes in a room with a telephone and phone books to contact an attorney. Officer Golgart asked her if she would like to continue with the implied-consent process, and she responded affirmatively. After Officer Golgart told her many times that a Chicago phone book was

11

not available, he re-read her the part of the implied-consent advisory that explains the opportunity to contact an attorney. When asked again if she was going to take the test, Williams responded, "I guess, yes."

Williams argues that she was coerced to consent to testing because she felt "pressur[ed]" by the officers reading her the implied-consent advisory, but the supreme court has held that officers reading the implied-consent advisory to a suspect is not unduly coercive without being combined with other factors. *Brooks*, 838 N.W.2d at 570–71. Although Williams testified that she had "anxiety" and was "scared" at the time she consented to the breath test, the supreme court has recognized that deciding whether to consent to testing is not "an easy or pleasant" choice to make and that "the criminal process often requires suspects and defendants to make difficult choices." *Id.* at 571 (quotations omitted). Nothing in the record suggests that Williams was subjected to any type of unconstitutional coercion, extended questioning, or prolonged custody by the police officers. Based on the totality of the circumstances, we hold that Williams voluntarily consented to a breath test and that a search warrant was not required.

## II.    Trial Evidence

Williams next asserts that the district court abused its discretion by excluding evidence of the DataMaster machine usage report and Burr's testimony on whether Williams's breath test result was accurate. We disagree.

"Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was

12

thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted). "We will reverse for an abuse of discretion where we find a clearly erroneous conclusion that is against logic and the facts on record." *State v. Williams*, 842 N.W.2d 308, 313 (Minn. 2014) (quotation omitted).

## A.    DataMaster Machine Usage Report

Williams states that the usage report should have been admitted as a business record. Under Minnesota Rule of Evidence 803(6), the following business records may be admissible as an exception to the general prohibition on hearsay evidence:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

To lay foundation for the admission of an exhibit under the business-records exception, "a qualified witness must testify that the records were kept in the course of a regularly-conducted business activity, and that it was the normal practice of that business to keep such records." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 95 (Minn. App. 2012). "The witness must be familiar with how the records are kept." *Id.* at 96. In addition, to preserve the issue for appeal, an offer of proof must be made by the party who attempted to admit the excluded evidence. Minn. R. Evid. 103(a)(2).

13

No such offer of proof was made here. Williams's counsel attempted to admit the DataMaster usage report during cross-examination of expert witness Erik Johnson. The DataMaster usage report shows a .001 difference in alcohol concentration on one of Williams's breath samples when compared with the breath test result that was admitted. Johnson testified that he was familiar with the type of report, but he did not testify that he created the DataMaster usage report or that he was familiar with the creation of similar reports. Williams's counsel made no offer of proof as to how the report was kept or prepared, what the context of the report was, or whether it was kept in the regular course of business. Accordingly, we conclude that the district court did not abuse its discretion by excluding the usage report from evidence. *See* Minn. R. Evid. 103(a)(2); Minn. R. Evid. 803(6).

### B.     Burr's Opinion Testimony

Williams contends that Burr should have been allowed to testify as an expert witness on whether the DataMaster machine's result was accurate. "The admission of expert testimony is within the broad discretion accorded [to] a [district] court, and rulings regarding materiality, foundation, remoteness, relevancy, or the cumulative nature of the evidence may be reversed only if the [district] court clearly abused its discretion." *State v. Ritt*, 599 N.W.2d 802, 810 (Minn. 1999) (quotation and citations omitted).

Minnesota Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise. The

14

> opinion must have foundational reliability. In addition, if the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community.

"Generally, expert testimony is admissible if (1) it assists the trier of fact; (2) it has a reasonable basis; (3) it is relevant; and (4) its probative value outweighs its potential for unfair prejudice." *State v. Wolf*, 592 N.W.2d 866, 868 (Minn. App. 1999), *aff'd*, 605 N.W.2d 381 (Minn. 2000). "[E]xperts must base their opinions on facts sufficient to form an adequate foundation for the opinion and should not be allowed to speculate." *Kwapien v. Starr*, 400 N.W.2d 179, 183 (Minn. App. 1987).

Thomas Burr testified at trial as an expert witness that the infrared-absorption technology used by the DataMaster machine could yield an inaccurate alcohol-concentration result if ketones were present in the breath sample. Before being asked if he thought Williams's specific test result was accurate, he testified that he reviewed "police reports," "DataMaster test records that [were] generated from Ms. Williams['s] test," and "three pages of maintenance records" for the DataMaster machine.

But evidence does not exist in the record to support the theory that the DataMaster machine malfunctioned or gave an inaccurate reading when testing Williams's breath samples. Similarly, Burr had no knowledge of whether ketones were present in Williams's breath that particular night. Burr's opinion on whether the DataMaster machine malfunctioned during Williams's breath test or whether ketones were present would have been speculative in nature, and expert witnesses "should not be allowed to speculate." *Kwapien*, 400 N.W.2d at 183; s*ee also Wolf*, 592 N.W.2d at 869 ("Testimony

15

of possible theories of malfunction for which no evidence exists in the record would not assist the trier of fact in resolving the factual issue of whether [appellant's] blood-alcohol level was more than .10."). In addition, Burr was allowed to testify generally about the DataMaster machine creating inaccurate alcohol-concentration results. For these reasons, we hold that the district court did not abuse its discretion by excluding from evidence Burr's ultimate opinion on whether Williams's test result was accurate.[1]

**Affirmed.**

---

[1] Williams raises a third issue, claiming that the cumulative errors of the district court deprived her of a fair trial and that she is entitled to a new trial. Because of our conclusions above, this claim lacks merit.