*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MALIEK THOMAS WILLIAMS,

        Defendant-Appellant.

UNPUBLISHED
August 12, 2021

No. 350671
Oakland Circuit Court
LC No. 2019-269653-FC

Before: TUKEL, P.J., and K. F. KELLY and GADOLA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for second-degree murder, MCL 750.317, assault with intent to murder, MCL 750.83, discharge of a weapon at a building causing death, MCL 750.234b(5), discharge of a weapon at a building causing injury, MCL 750.234b(3), felon in possession of a firearm (felon-in-possession), MCL 750.224f, and five counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced, as a third-offense habitual offender, MCL 769.11, to 60 to 90 years' imprisonment for the second-degree murder conviction, 20 to 45 years' imprisonment for the assault with intent to murder and the discharge of a firearm at a building causing death convictions, 10 to 30 years' imprisonment for the discharge of a firearm at a building causing injury conviction, 2 to 10 years' imprisonment for the felon-in-possession conviction, and two years' imprisonment for each of the five felony-firearm convictions. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises out of a shooting at the Retreat Apartments in Farmington Hills, Michigan, in the early morning hours of October 15, 2018. As a result of the shooting, Alex Ward was killed, and Maliek Lewis was injured. Farmington Hills Police Officer Ryan Rosenick was dispatched to respond within a minute of the shooting. As he drove into the apartment complex, Officer Rosenick saw a white Chevy Equinox traveling at a high rate of speed. The officer had to drive a speed of nearly 100 miles per hour to catch the vehicle and perform a traffic stop. The occupants, Jamir Brown-Gray, Steven Davis, and defendant, were arrested in association with the shooting. In a subsequent search of the vehicle, three firearms were found underneath the center console.

On October 15, 2018, defendant was interviewed by police regarding the shooting during which he waived his rights to remain silent and to counsel. Defendant contended that he, Brown-Gray, and Davis were in the apartment parking lot to purchase and smoke marijuana when they heard gunshots and drove away. Defendant asserted that he did not know the victims and had nothing to do with the shooting. On October 17, 2018, he was interviewed for a second time. Defendant asserted very little during this interview and maintained that he had nothing to do with the shooting. During this interview, defendant invoked his right to counsel, and the interview ended.

On October 18, 2018, defendant requested to speak to an investigator regarding the incident. During defendant's interview with Lieutenant Richard Wehby, defendant admitted to shooting Ward and Lewis. Defendant told Lieutenant Wehby that Ward had previously "shot up" the home of defendant's mother. As a result, on October 14, 2018, defendant and Brown-Gray learned that Ward was at the family restaurant known as Chuck E. Cheese. When they arrived at the restaurant to jump Ward, he was leaving. Defendant and Brown-Gray followed Ward to the Retreat Apartments where they saw Ward go into an apartment building. Later in the night, while defendant was with Brown-Gray and Davis, defendant told Brown-Gray to drive him back to the Retreat Apartments. Defendant confessed that he left Brown-Gray's vehicle, went up to the apartment building, and when he saw Ward and Lewis inside an apartment, he got onto the balcony of the apartment and watched Ward. Once defendant saw Ward sit down on the couch, he started to shoot into the apartment.

After defendant was charged in this case, he filed a motion to suppress the statements he made to Lieutenant Wehby on October 18, 2018. Defendant asserted that he did not shoot Ward or Lewis; rather, on the night of the shooting he, Brown-Gray, and Davis went to a hookah bar to celebrate defendant's birthday. After leaving the hookah bar, defendant fell asleep in the backseat of Brown-Gray's vehicle. Defendant remembered arriving at an apartment complex, but his vision was blurry from the alcohol. Defendant asserted that he did not fully wake up until Brown-Gray was pulling out of the Retreat Apartment complex, and they were being pulled over by the police. Defendant argued that his statements to Lieutenant Wehby should be suppressed because defendant was coerced into taking the blame for the shooting by Davis and Brown-Gray. Defendant contended that Davis threatened to kill defendant's family if he did not take the blame, and Brown-Gray promised defendant $20,000 for a lawyer. Further, defendant asserted that he was not readvised of his *Miranda*[1] rights prior to speaking to Lieutenant Wehby. For these reasons, defendant contended that his statements to Lieutenant Wehby should be suppressed because they were not made voluntarily. The trial court denied defendant's motion finding that defendant knowingly and intelligently made his statements to Lieutenant Wehby.

At trial, the police testified regarding their arrest of defendant and his co-defendants in proximity to the timing of the shooting and the flight from the crime scene, the investigation of shoeprints near the scene, fingerprint and DNA analysis of the weapons, retrieval of data including text messages from the cell phones belonging to defendant and his co-defendants, and the statements made by defendant. In contrast, defendant testified at trial that he was intoxicated that

---

[1] *Miranda v Arizona*, 384 US 436, 467; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

evening and merely present in the vehicle. He claimed that any prior statements to the contrary were the result of threats and pressure from his co-defendants. Nonetheless, the jury convicted defendant of the offenses pertaining to the shooting of Ward and Lewis at the apartment that night.

## II. OFFENSE VARIABLES (OV)

Defendant contends that the trial court erred when it assessed 15 points for OV 5, 15 points for OV 10, 25 points for OV 13, and 10 points for OV 14. We disagree.

"A claim that the sentencing guidelines range was improperly calculated is preserved by raising the issue at sentencing, in a motion for resentencing, or in a motion to remand." *People v Sours*, 315 Mich App 346, 348; 890 NW2d 401 (2016) (citation and quotation marks omitted). During the sentencing hearing, defendant objected to the scoring of 10 points for OV 14, arguing that there was no evidence that defendant was the leader of the offense. Nonetheless, the trial court assessed 10 points for OV 14. Thus, defendant's argument regarding the scoring of OV 14 is preserved for appellate review. Defendant did not object to the scoring of OVs 5, 10, or 13 at the sentencing hearing, and defendant neither filed a motion for resentencing nor a motion to remand. Thus, defendant's arguments in regard to OVs 5, 10, and 13 are not preserved for appellate review.

"A trial court's findings of fact at sentencing must be supported by a preponderance of the evidence; this Court reviews a trial court's findings of fact for clear error." *People v Maben*, 313 Mich App 545, 549; 884 NW2d 314 (2015). "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Anderson*, 284 Mich App 11, 13; 772 NW2d 792 (2009) (citation and quotation marks omitted). "This Court reviews de novo whether the facts are adequate to satisfy the statutory criteria for scoring the variable." *Maben*, 313 Mich App at 549. This Court reviews unpreserved issues for plain error affecting defendant's substantial rights. *People v Solloway*, 316 Mich App 174, 197; 891 NW2d 255 (2016). To establish plain error, "it must be found that (1) an error occurred, (2) the error was plain or obvious, and (3) the plain error affected the defendant's substantial rights." *Id*. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

When calculating the sentencing guidelines, a sentencing court may consider all record evidence before it, including the contents of a presentence investigation report, plea admissions, and testimony presented at a preliminary examination or trial. *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170 (2012). "[T]he trial court may rely on inferences that arise from the record evidence when making the findings underlying its scoring of offense variables." *People v McFarlane*, 325 Mich App 507, 532; 926 NW2d 339 (2018).

### A. OV 5

Defendant argues that the trial court erred in assessing 15 points for OV 5 because there is no evidence that a member of Ward's family suffered from a serious psychological injury requiring professional treatment. We disagree.

"OV 5 is scored when a homicide or homicide-related crime causes psychological injury to a member of a victim's family." *People v Calloway*, 500 Mich 180, 184; 895 NW2d 165 (2017).

A trial court should assess OV 5 at 15 points when "[s]erious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(a). However, "[i]n making this determination, the fact that treatment has not been sought is not conclusive," but rather, a trial court should "[s]core 15 points if the serious psychological injury to the victim's family *may* require professional treatment." MCL 777.35(2) (emphasis added). "In this context, 'serious' is defined as 'having important or dangerous possible consequences.' " *Calloway*, 500 Mich at 186, quoting *Merriam-Webster's Collegiate Dictionary* (11th ed) (footnote omitted). "Thus, in scoring OV 5, a trial court should consider the severity of the injury and the consequences that flow from it, including how the injury has manifested itself before sentencing and is likely to do so in the future, and whether professional treatment has been sought or received." *Calloway*, 500 Mich at 186.

On appeal, defendant focuses only on whether there was sufficient evidence of a serious psychological injury to Ward's mother, Raynita Ward, to warrant assessing 15 points for OV 5. However, Ward's sister, Alexus Jones, wrote a victim impact statement in which she discussed that she had a bond like no other with Ward, who was her only brother. Jones explained that Ward was very close with his three-year-old son, and it brought Jones to tears when she had to explain to Ward's son that he cannot see his father. Further, Jones asserted that, since Ward's death, she has "had to see a therapist once a week and sometimes even twice." Jones further stated that she suffers from depression and posttraumatic stress disorder, and she has been financially unstable after having to take a three-month mental health leave from work to assist her family. On the basis of Jones's victim impact statement, there was sufficient evidence for the trial court to find that Ward's death caused a family member to suffer a "[s]erious psychological injury requiring professional treatment[.]" MCL 777.35(1)(a).

Raynita spoke during Davis's sentencing hearing regarding her grandson's repeated requests to see Ward and its impact upon her. Additionally, she reported that she cried daily, had yet to return to work, no longer hosted family dinners, and stopped attending church regularly because it reminded her of Ward. In light of these statements, Raynita suffered psychological consequences that "*may* require professional treatment." MCL 777.35(2) (emphasis added). Statements given by a member of the victim's family were sufficient for the trial court to assess 15 points for OV 5. *Calloway*, 500 Mich at 189. Thus, on the basis of Jones's and Raynita's statements, the trial court did not err in assessing 15 points for OV 5.

B. OV 10

Defendant submits that the trial court erred in assessing 15 points for OV 10 because defendant did not engage in predatory conduct prior to the sentencing offense. We disagree.

"Under MCL 777.40(1)(a), a trial court properly assesses 15 points for OV 10 if the court finds that an offender (1) exploited a vulnerable victim and (2) engaged in predatory conduct." *People v Barnes*, 332 Mich App 494, 500-501; 957 NW2d 62 (2020). "A 'vulnerable victim' is one who has 'readily apparent susceptibility . . . to injury, physical restraint, persuasion or temptation.' " *Id*., quoting MCL 777.40(3)(c). A trial court should consider the following factors when determining whether a victim was vulnerable under OV 10:

(1) the victim's physical disability, (2) the victim's mental disability, (3) the victim's youth or agedness, (4) the existence of a domestic relationship, (5) whether the offender abused his or her authority status, (6) whether the offender exploited a victim by his or her difference in size or strength or both, (7) whether the victim was intoxicated or under the influence of drugs, or (8) whether the victim was asleep or unconscious. [*People v Cannon*, 481 Mich 152, 158-159; 749 NW2d 257 (2008).]

However, "[t]he absence of these factors does not preclude a finding of victim vulnerability when determining whether it is appropriate to assess 15 points for predatory conduct so long as the evidence shows that the victim was otherwise vulnerable as defined in MCL 777.40(3)(c)." *Barnes*, 332 Mich App at 502, citing *Cannon*, 481 Mich at 159 n 11. "The statute does not mandate that this 'susceptibility' be *inherent* in the victim. Rather, the statutory language allows for susceptibility arising from external circumstances as well." *People v Huston*, 489 Mich 451, 466; 802 NW2d 261 (2011) (emphasis in original).

In *Huston*, our Supreme Court concluded that the trial court did not err in assessing 15 points for OV 10, when:

the victim was alone in the dark, and defendant and his cohort outnumbered her. Moreover, a key fact that greatly increased the "vulnerability" of the victim in these specific circumstances was that defendant and his cohort were lying in wait for her, armed and hidden from her view. By lying in wait for a victim in the manner that defendant did here, he made the victim more "susceptib[le] . . . to injury [or] physical restraint," i.e., more "vulnerable." [*Id*. (footnote omitted).]

"[L]ying in wait requires three elements: concealment, watching, and waiting." *Id*. at 466 n 10 (citation and quotation marks omitted).

Each of these elements, when joined together, has the potential to render any member of the public vulnerable to criminal activity, as the perpetrator by such conduct both strengthens his own hand and weakens that of the public, until the former believes that his opportunity to victimize the latter has been optimized. [*Id*.]

Here, evidence established that defendant told Lieutenant Wehby that he and Brown-Gray learned that Ward was at a family restaurant earlier in the day. They proceeded to that location with the intention of jumping Ward. When they arrived and saw that Ward was already departing, defendant and Brown-Gray followed Ward to the Retreat Apartments and saw Ward enter an apartment building. Later in the night, defendant returned to the apartments and ran to the building that he had previously seen Ward enter earlier that day. Defendant started looking through windows, and when he saw Ward and Lewis inside, defendant straddled the rails of the balcony and watched Ward for approximately three minutes. When defendant saw Ward sit down on the couch, defendant started shooting.

Thus, defendant followed Ward, watched him, and waited for Ward to stop moving with the intention of shooting him. Defendant was lying in wait, armed, and hidden from view waiting

for the opportunity to victimize Ward. Defendant's actions made Ward more susceptible to injury, i.e., more vulnerable.

The next question is whether defendant's conduct amounted to "predatory conduct." " 'Predatory conduct' means preoffense conduct directed at a victim . . . for the primary purpose of victimization." MCL 777.40(3)(a). " '[P]redatory conduct' 'inherently involves some level of exploitation,' and thus 'points may be assessed under OV 10 for exploitation of a vulnerable victim when the defendant has engaged in conduct that is considered predatory under the statute.' " *Huston*, 489 Mich at 468. The *Huston* Court explained that "predatory conduct"

> does not encompass *any* "preoffense conduct," but rather only those forms of "preoffense conduct" that are commonly understood as being "predatory" in nature, e.g., lying in wait and stalking, as opposed to purely opportunistic criminal conduct or "preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequent escape without detection." [*Id*. at 462 (emphasis in original).]

Defendant engaged in predatory conduct. As described above, defendant located Ward with the intention of attacking him. Defendant followed Ward, returned later in the night, and watched Ward for the opportunity to attack him. Thus, defendant's actions amounted to lying in wait or stalking Ward. Therefore, defendant engaged in preoffense conduct "for the primary purpose of victimization." MCL 777.40(3)(a). The trial court correctly scored OV 10 at 15 points.

C. OV 13

Defendant alleges that the trial court erred in assessing 25 points for OV 13 because defendant did not engage in a pattern of felonious criminal activity involving three or more crimes against a person. We disagree.

"Under MCL 777.43, the trial court must score points under OV 13 on the basis of a defendant's felonious acts that constitute a continuing pattern of criminal behavior." *People v Bemer*, 286 Mich App 26, 33; 777 NW2d 464 (2009). The trial court must assess 25 points when the sentencing offense "was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(c); *Bemer*, 286 Mich App at 33. "When determining the appropriate points under this variable, 'all crimes within a 5–year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction.' " *Id*. quoting MCL 777.43(2)(a).

Defendant contends that the act of shooting into the apartment constituted a single felonious act and that *People v Carll*, 322 Mich App 690, 704; 915 NW2d 387 (2018) is controlling. In *Carll*, the defendant purposefully drove through a stop sign without attempting to stop and hit another vehicle. *Id*. at 694-695, 698. The accident killed one person and injured three others. *Id*. at 694-695. The jury convicted the defendant of one count of reckless driving causing death, MCL 257.626(4), and three counts of reckless driving causing serious impairment of a bodily function, MCL 257.626(3). On appeal, this Court concluded that the trial court erred in assessing 25 points for OV 13 when the defendant had no prior record and all four convictions resulted from a single act. *Id*. at 704. This Court agreed with the defendant and concluded that

the "[d]efendant's reckless driving constitutes a single act, and although there were multiple victims, nothing was presented to show that he committed separate acts against each individual victim in the course of the reckless driving." *Id*. at 705-706 (footnote omitted).

However, multiple concurrent offenses arising out of the same incident are properly used in scoring OV 13. *People v Gibbs*, 299 Mich App 473, 488; 830 NW2d 821 (2013). In *Gibbs*, this Court concluded that OV 13 was properly scored at 25 points where the defendant robbed a jewelry store, but also took the personal property of two individuals present in the store. *Id*. at 478. We approved the OV 13 scoring because "while the robberies arose out of a single criminal episode, Gibbs committed three separate acts against each of the three victims and these three distinct crimes constituted a pattern of criminal activity." *Id*. at 488.

We reject defendant's contention that *Carll* is controlling because he merely "swung up on the balcony with a gun in each hand, shot randomly and then ran to the waiting car." Rather, defendant observed Ward prior to the shooting at a family restaurant and followed him to an apartment building. Defendant later returned to the location and looked through the windows to find Ward. In the course of his observations, defendant also knew Lewis was in the apartment. Defendant waited until Ward was seated to begin firing and struck both occupants of the apartment. Ward was shot three times and Lewis was shot once. There were 22 spent shell casings from a .40 caliber weapon at the scene, and exterior damage to the apartment's windows and sliding glass door. Thus, defendant fired the gun more than once, striking two victims. The trial court was entitled to consider these acts separately. Moreover, defendant acknowledged that he had a prior qualifying crime. Therefore, defendant committed three felonious acts against a person within a five-year period. It was not plainly erroneous for the trial court to assess 25 points for OV 13.

D. OV 14

Defendant contends that the trial court erred in assessing 10 points for OV 14 because defendant was not the leader of this offense. We disagree.

OV 14 addresses the offender's role in the offense, and "[t]he sentencing court must assess 10 points if '[t]he offender was a leader in a multiple offender situation.' " *Gibbs*, 299 Mich App at 493, quoting MCL 777.44(1)(a). Moreover, when scoring OV 14, "[t]he entire criminal transaction should be considered," and "[i]f 3 or more offenders were involved, more than 1 offender may be determined to have been a leader," MCL 777.44(2)(a),(b). "[T]o 'lead' is defined in relevant part as, in general, guiding, preceding, showing the way, directing, or conducting." *People v Dickinson*, 321 Mich App 1, 22; 909 NW2d 24 (2017) (citation and quotation marks omitted). "[F]or purposes of an OV 14 analysis, a trial court should consider whether the defendant acted first or gave directions or was otherwise a primary causal or coordinating agent." *Id*. (citation and quotation marks omitted).

The sentencing court found that, on the basis of defendant's statements to Lieutenant Wehby, defendant could be considered the leader. Defendant told Lieutenant Wehby that he had a motive to shoot Ward because he believed that Ward "shot up" his mother's home. Defendant also told Lieutenant Wehby that he and Brown-Gray went to a family restaurant where Ward was supposed to be, they saw Ward get into a vehicle with an unknown man, and they followed Ward to the Retreat Apartments. Although defendant and Brown-Gray left the apartments at that point,

it was defendant's idea to return to the Retreat Apartments. When he returned, defendant got out of the Equinox, ran up to the apartment, waited for Ward to take a seat on the couch, and fired into the apartment where Ward and Lewis were located. Once defendant returned to the Equinox, he told Brown-Gray to "go, go, go[.]" Defendant also told Lieutenant Wehby that, once they saw the police, it was defendant's idea to make up the story that they had only been at the Retreat Apartments to buy and smoke marijuana when they heard the gunshots. On the basis of defendant's statements, the trial court properly found, by a preponderance of the evidence, that defendant "acted first or gave directions or was otherwise a primary causal or coordinating agent." *Dickinson*, 321 Mich App at 22.

### III. PROPORTIONALITY

Defendant submits that his minimum sentence of 60 years' imprisonment was disproportionate. We disagree.

"This Court reviews the proportionality of a trial court's sentence for an abuse of discretion." *People v Foster*, 319 Mich App 365, 375; 901 NW2d 127 (2017). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*.

In *People v Lockridge*, 498 Mich 358, 399; 870 NW2d 502 (2015), our Supreme Court held that the sentencing guidelines are advisory only, and "[a] sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *Id*. at 391-392. The appropriate inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality. *People v Steanhouse* 500 Mich 453, 459; 902 NW2d 327 (2017). This "principle of proportionality" set forth in *People v Milbourn*, 435 Mich 630, 636, 461 NW2d 1 (1990), requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender. *Steanhouse*, 500 Mich at 459-460.

However, "[w]hen a trial court does not depart from the recommended minimum sentencing range, the minimum sentence must be affirmed unless there was an error in scoring or the trial court relied on inaccurate information." *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016), citing MCL 769.34(10). Furthermore, a "sentence within the guidelines range is presumptively proportionate," and "[a] defendant can only overcome the presumption by presenting unusual circumstances that would render a presumptively proportionate sentence disproportionate," such as a sentence that constitutes cruel and unusual punishment. *People v Posey*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket Nos. 345491; 351834); slip op at 7-8.

To support the challenge to proportionality, defendant contends that the trial court erred in scoring OVs 5, 10, 13, and 14, but we conclude that the trial court's scoring of the guidelines was proper. Thus, defendant's minimum sentence of 60 years' imprisonment for second-degree

murder was within the minimum sentencing guidelines range; therefore, the sentence is presumptively proportionate. Accordingly, we reject defendant's proportionality challenge.[2]

## IV. *MIRANDA* RIGHTS

Defendant alleges that the trial court erred in denying defendant's motion to suppress his statements when he was not readvised of his *Miranda* rights prior to making his statements. We disagree.

> This Court reviews for clear error a trial court's factual findings in a ruling on a motion to suppress evidence. A trial court's factual findings are clearly erroneous when this Court is left with a definite and firm conviction that the trial court made a mistake. The decision whether to admit evidence is within a trial court's discretion. This Court reverses it only where there has been an abuse of discretion. A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo. [*People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019) (citations and quotation marks omitted).]

When an officer interrogates a person who is in custody, that person must clearly be informed he has the right to remain silent and that anything that he says can be used against him in court. Further, a person in custody must be advised of the right to consult a lawyer, to have the lawyer present during interrogation, and that, if he cannot afford a lawyer, one will be appointed for him. *Id*. at 414-416. Once an accused exercises his right to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel is provided. *Id*. at 416. Once a suspect exercises his right to counsel and the right to remain silent, an officer may not engage in interrogation without providing the requested lawyer unless the suspect initiates further communication, exchanges, or conversations with the police. *Id*. "[T]he failure to reread a defendant's Miranda rights prior to each interrogation does not render his subsequent statements inadmissible as evidence against him." *People v Godboldo*, 158 Mich App 603, 607; 450 NW2d 114 (1986). Rather, the trial court must examine whether the statements were voluntary. *Id*.

In the present case, the trial court presided over the evidentiary hearing and viewed the three videos of the interrogations. The trial court found that defendant was in full control of his faculties, understood his rights, was not impaired by a lack of education, but was at least of normal intelligence, and was involved in prior criminal process. The trial court found that there was compliance with *Miranda*, and the statement was voluntary. Under the circumstances, we cannot

---

[2] Defendant also asserted that the trial court failed to justify the sentence imposed and compared it to the sentences his co-defendants received, particularly in light of defendant's young age. However, as defendant also acknowledged, defendant was sentenced as a habitual third offender, and his record was not commensurate with his co-defendants.

conclude that the trial court clearly erred in denying the motion to suppress in light of its factual findings, *Clark*, 330 Mich App at 415, and the lack of a requirement that *Miranda* be read before each interrogation, *id*. at 420-421; *Godboldo*, 158 Mich App at 607.[3]

Affirmed.

/s/ Jonathan Tukel
/s/ Kirsten Frank Kelly
/s/ Michael F. Gadola

---

[3] Although not raised in his statement of questions presented, defendant also claimed that his statement was not voluntary because it was coerced by his co-defendants' threats against his family and promise of financial payment. The trial court noted defendant's claim, but nonetheless found that the statement was voluntary, and we cannot conclude that the trial court abused its discretion in light of its factual findings. *Clark*, 330 Mich App at 415.